IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LONE STAR SILICON INNOVATIONS LLC | No. C 17-03980 WHA<br>No. C 17-03981 WHA<br>No. C 17-04032 WHA<br>No. C 17-04033 WHA<br>No. C 17-04034 WHA<br>No. C 17-05458 WHA |
| | **ORDER GRANTING MOTIONS TO DISMISS** |

  /

**INTRODUCTION**

Defendants in six related patent infringement actions move to dismiss on the basis that plaintiff in all six lacks standing. To the extent stated below, the motions are **GRANTED**.

**STATEMENT**

The essence of this problem is that the patent owner tried to find a way to shield itself from counterclaims while retaining a way to reap the monetary benefits of suing competitors and others for infringement of its patents. Its mechanism for that neat trick was a "patent transfer agreement" that seemed to include the magic wording required to authorize a non-practicing entity to sue. But other wording in the same agreement subtracted from those provisions and thus rendered the agreement insufficient to sustain standing for the non-practicing entity under Federal Circuit law.

\* \* \*

In the six above-captioned actions, plaintiff Lone Star Silicon Innovations LLC, a non-practicing entity with its principal place of business in Plano, Texas, asserts claims for patent infringement against Semiconductor Manufacturing International Corporation, Semiconductor Manufacturing International (Shanghai) Corporation, Semiconductor Manufacturing International (Beijing) Corporation, and SMIC, Americas (collectively, "SMIC"); Renesas Electronics Corporation and Renesas Electronics America Inc. (collectively, "Renesas"); Nanya Technology Corporation, Nanya Technology Corporation, U.S.A., and Nanya Technology Corporation Delaware (collectively, "Nanya"); United Microelectronics Corporation and UMC Group (USA) (collectively, "UMC"); Toshiba Corporation, Toshiba America, Inc., and Toshiba America Electronic Components, Inc. (collectively, "Toshiba"); and Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Consumer Products Group, Inc., and Micron Memory Japan, Inc. (collectively, "Micron"). These actions originated in the Eastern District of Texas and transferred to our district in mid-2017.

Lone Star currently asserts the following patents against each group of defendants:

- SMIC — 5,973,372 ("the '372 patent") and 6,388,330 ("the '330 patent")
- Renesas — 6,153,933 and the '330 patent
- Nanya — 6,097,061 ("the '061 patent") and the '330 patent
- UMC — the '372 patent and the '330 patent
- Toshiba — 5,912,188 ("the '188 patent"), 6,023,085 ("the '085 patent"), the '330 patent, and RE39,518
- Micron — the '188 patent, the '085 patent, the '061 patent, and the '330 patent

Each of the patents-in-suit originally issued to Advanced Micro Devices, Inc., a multinational semiconductor company based in Sunnyvale, California. On August 4, 2016, AMD and Lone Star entered into a patent transfer agreement that encompassed various patents, including the patents-in-suit, and executed an assignment for those patents. The complaint in each of the six above-captioned actions alleges that Lone Star is the "assignee" and "sole owner" of the patents-in-suit. Lone Star, however, did not produce the patent transfer agreement until October 2017 — months after the actions commenced.

Section 2.1 of the patent transfer agreement gave Lone Star "all right, title and interest in, to and under the Assigned Patents . . . including any and all inventions and discoveries claimed therein, any and all legal rights entitled by the original owner of the Assigned Patents and all rights of AMD to sue for past, present and future infringement of any and all of the Assigned Patents." In exchange, Section 5.1 gave AMD 35 to 50 percent of the proceeds from Lone Star's "monetization efforts." No provision in the patent transfer agreement addressed Lone Star's right (or lack thereof) to practice the patents-in-suit.

Despite the broad language of Section 2.1, other provisions in the same agreement substantially curtailed Lone Star's rights. For example, Section 4.1 gave AMD "a fully paid up, irrevocable, worldwide, transferable, non-exclusive, license under the Assigned Patents to use, develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of [its] Licensed Products," which includes "all of its software, hardware, products, designs, services, and activities." Section 2.3 further required Lone Star to comply with "Existing Encumbrances" and "to make any and every future sale, transfer, assignment, lien, mortgage or other encumbrance of the Assigned Patents subject to the Existing Encumbrances and the license and other rights granted under Section 4," with "Existing Encumbrances" broadly defined as:

> (a) pre-existing patent licenses, covenants not to assert, promises or agreements to license, and/or similar patent immunities; (b) rights to renew or extend pre-existing patent licenses exercised unilaterally by third parties (such as legally binding options); (c) releases for past infringement; and/or (d) pre-existing commitments related to AMD's or its Affiliates' standardization activities or patent pool activities, and other pre-existing specification-related or standards-related licenses, covenants and promises of AMD or any of its Affiliates, which, in each of (a), (b), (c) and (d), shall transfer in connection with the transfer of the Assigned Patent(s) and/or which AMD or any of its Affiliates has committed to maintain in connection with the transfer of such Assigned Patent(s).

Section 2.6 further restricted Lone Star's ability to transfer the patents-in-suit:

> Any assignment of an Assigned Patent in violation of this Section 2.6 shall be void ab initio. Lone Star will not transfer ownership of any of the Assigned Patents unless: (a) all Assigned Patents are transferred collectively; (b) the proposed successor-in-interest agrees to be bound by this Agreement (with the successor-in-interest taking the place of Lone Star for all purposes of this

3

> Agreement) including, but not limited to, obtaining ownership of any of the Assigned Patents subject to any and all Existing Encumbrances, in writing enforceable by AMD and with a copy provided to AMD; and (c) AMD provides its written consent to the transfer, which shall not be unreasonably withheld.

Finally, Section 6.2(f) explicitly limited Lone Star's enforcement rights to specific "Unlicensed Third Party Entities" listed in Exhibit E to the patent transfer agreement:

> Lone Star acknowledges that the Assigned Patents are subject to Existing Encumbrances to other Persons and that Lone Star represents and warrants that it shall not commence, direct or control any legal action seeking to enforce and/or licensing activity asserting any of the Assigned Patents against a Person that is (1) not an Unlicensed Third Party Entity or Affiliate thereof, or (2) is a distributor, reseller, or direct or indirect customer with respect to materials, devices, software or firmware, services or products that are used, made or supplied directly or indirectly by or for a Person that is not an Unlicensed Third Party Entity.

Section 3.3(c) added that "[t]he Parties shall cooperate in good faith in attempting to identify additional third-parties that the Parties may agree, *at each's sole discretion*, to add to the Exhibit E list of Unlicensed Third Party Entities" (emphasis added).

After receiving the patent transfer agreement, all defendants moved to dismiss on the basis that Lone Star had no standing to sue thereunder. This order follows full briefing in each of the above-captioned actions (*i.e.*, eighteen briefs in total) and oral argument.[1]

## ANALYSIS

The question of standing is jurisdictional. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). The party bringing the action bears the burden of establishing it has standing. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975–96 (Fed. Cir. 2005) (citation omitted). The Federal Circuit has recognized three general categories of plaintiffs in analyzing the standing issue in patent infringement actions. *First*, a patentee or assignee of "all rights or all substantial rights" under the patent can sue in its own name alone. *Second*, an exclusive licensee or other party with exclusionary rights — but not "all substantial rights" — can sue, but must usually join the patentee to avoid "the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer." Joinder also "protects the

---

[1] In Case No. 17-5458, Micron styled its motion as one for judgment on the pleadings. That motion, however, seeks the same relief as the other defendants' motions to dismiss and thus receives no separate treatment herein.

4

patentee from losing substantial rights if its patent claims are invalidated or the patent rendered unenforceable in an action in which it did not participate." *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1350 (Fed. Cir. 2016). *Third*, a party that holds "less than all substantial rights to the patent" and lacks exclusionary rights thereunder cannot sue or even participate alongside the patent owner as a party to an infringement action. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–41 (Fed. Cir. 2007) (citations omitted).

The instant motions concern only the first category since Lone Star claims to be an "assignee" and "sole owner" of the patents-in-suit under its patent transfer agreement with AMD. To create an assignment, a contract must transfer (1) the entire exclusive patent right, including "all substantial rights in the patent"; (2) an undivided interest in the patent right; or (3) the entire exclusive patent right within any geographical region of the United States. An agreement that does not transfer one of these three interests is merely a license. *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 618 (Fed. Cir. 2016). Whether an agreement constitutes an assignment or license depends not on the "labels" or "bare formalities" of title transfer but on the "substance of what was granted." *Ibid.*

The Federal Circuit has observed that the exclusive right to make, use, and sell products or services under the patent is "vitally important" to assignment, and that the nature and scope of the right to sue accused infringers and license the patent is the "most important factor" to consider. *Id.* at 619 (quoting *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360–61 (Fed. Cir. 2010)).

Other rights that should be examined include the scope of the licensee's right to sublicense, the licensor's reversionary rights following breach or termination of the license agreement, the licensor's right to proceeds from litigation or licensing activities, the duration of the licensee's rights, the licensor's ability to supervise and control the licensee's activities, the licensor's obligation to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent. *See Mann*, 604 F.3d at 1360–61.

Both sides cite selective snippets of various favorable-sounding authorities in their briefs. Considering the *Mann* factors as a whole, however, the controlling decision with

underlying facts closest to ours is *Diamond Coating*. There, as here, the plaintiff claimed standing to sue on the basis that it had received "all substantial rights" in the patents-in-suit through a patent assignment and transfer agreement. *See* 823 F.3d at 618. The district court disagreed, holding that the actual terms of the agreement weighed against finding a transfer of substantial rights because (1) the plaintiff could not assign the agreement to another party without the transferor's consent; (2) the transferor retained an economic interest in future proceeds, including from infringement litigation; (3) the transferor retained a license to practice the patents-in-suit; and (4) the transferor retained significant control over enforcement decisions because the agreement conditioned enforcement on consideration of both the transferor and the plaintiff's "best interests." On appeal, the plaintiff argued, as Lone Star does here, that it had the sole right to exclude others, had the sole right to sue, could assign or sell the patents-in-suit, and could enforce the patents-in-suit free from the transferor's control. *Id.* at 619.

The Federal Circuit affirmed based on two aspects of the agreement. *First*, a "licensor's retention of a limited right to develop and market the patented invention indicates that the licensee failed to acquire all substantial rights," and the agreement allowed the transferor to keep "'a world-wide, royalty-free, non-exclusive, non-sublicensable, non-transferable right and license to practice the methods and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit any' products covered by the patents-in-suit." Indeed, the agreement did not even grant the plaintiff practicing rights but limited it to the "prosecution, maintenance, licensing, litigation, enforcement and exploitation" of the patents-in-suit and explained that it would "engage in no other business or activity." The Federal Circuit specifically rejected the argument that the plaintiff's right to "exploitation" implied the right to make, use, and sell the patented invention. The Federal Circuit noted that the agreement explicitly provided such rights to the transferor, so if the parties to the agreement had intended to also provide such rights to the plaintiff, "they knew how to say so." Thus, with respect to the "vitally important" exclusive right to make, use, and sell products or services under the patent, the plaintiff "unquestionably failed to acquire all substantial rights in the patents-in-suit." *Id.* at 619–20 (citation and internal modifications omitted).

6

*Second*, the transferor in *Diamond Coating* "retained significant control over [the plaintiff's] enforcement and litigation activities" because the agreement (1) conditioned such activities on consideration of the transferor's "best interests," (2) prohibited the plaintiff from licensing the patents-in-suit jointly with patents owned by other parties absent the transferor's written consent, and (3) included a list of companies that the plaintiff reserved the right to *not* assert the patents-in-suit against, and another list of companies that the transferor reasonably believed represented "licensing opportunities," thereby indicating that the plaintiff did not enjoy "unfettered discretion on enforcement." *Id.* at 620–21. Although *Diamond Coating* styled its analysis of these terms as bearing on "the nature and scope of the patentee's retained right to sue accused infringers and license the patent," *see id.* at 619, it seemed to also implicate other *Mann* factors, including the scope of the plaintiff's right to sublicense, the transferor's ability to supervise and control the plaintiff's activities, and limits on the plaintiff's right to assign its interests in the patents-in-suit. *See Mann*, 604 F.3d at 1360–61.

After analyzing the two foregoing issues, *Diamond Coating* concluded the agreement therein "did not convey all of the substantial rights in the patents-in-suit" to the plaintiff. The same result obtains here given our similar facts.

*First*, as stated, the patent transfer agreement did not grant Lone Star any practicing rights. Lone Star insists it had such rights by implication through Section 2.1, which provided it with "all right, title and interest in, to and under the Assigned Patents . . . including any and all inventions and discoveries claimed therein, any and all legal rights entitled by the original owner of the Assigned Patents and all rights of AMD to sue for past, present and future infringement of any and all of the Assigned Patents." *Lone Star's reliance on this provision is misplaced given that other provisions in the same agreement plainly curtailed Lone Star's rights thereunder notwithstanding the superficially-broad language of Section 2.1.*[2]

---

[2] Defendants also point out that the purported "assignment" in *Diamond Coating* also contained superficially-broad language granting the plaintiff "all right, title, and interest" in the patents-in-suit, but that language did not suffice to establish standing by assignment. This argument enjoys some force but is not relied upon in this order because the *Diamond Coating* decision did not specifically examine the language cited by defendants in its analysis.

7

Lone Star also argues that, as a practical matter, it "obviously" acquired the unfettered right to practice the patents-in-suit because only it can enforce them. This argument is just another attempt to conjure up practicing rights by implication and remains unpersuasive for the reasons already stated. The suggestion that, as a practical matter, no one can stop Lone Star from practicing the patents-in-suit also rings particularly hollow given that Lone Star is a non-practicing entity. Moreover, the plaintiff in *Diamond Coating* similarly attempted to rely on its "sole right to sue" to no effect. The same argument fails to distinguish *Diamond Coating* here.

Even assuming for the sake of argument that Lone Star indeed has some right to practice the patents-in-suit, any such right is certainly not exclusive. As stated, Section 4.1 preserved AMD's practicing rights and Section 2.3 preserved the "Existing Encumbrances," including practicing rights, of other entities. Lone Star cites *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846 (2015), and *Luminara*, 814 F.3d 1343, for the proposition that AMD's retention of a non-exclusive license to practice the patented inventions does not prevent assignment of the patents-in-suit. Both decisions are readily distinguishable.

In *Azure Networks*, the principle relied upon in *Diamond Coating* — that a "licensor's retention of a limited right to develop and market the patented invention indicates that the licensee failed to acquire all substantial rights" — enjoyed "little force" because the licensor did not make or sell any products, nor would it make or sell any products in the future. *See* 771 F.3d at 1344. Here, in contrast, AMD actually practices the patents-in-suit and has expressly preserved the "Existing Encumbrances" of other entities ostensibly practicing the patents-in-suit. Under our circumstances, *Diamond Coating* remains the better authority.

*Luminara* considered a limited set of rights retained by the licensor — the right to practice the patents at issue, the title to those patents, the responsibility to pay maintenance fees, a financial interest in litigation and licensing, and a right to notice of litigation and licensing activities — and concluded they were not substantial enough to preclude assignment. *See* 814 F.3d at 1351. *Luminara* did not have occasion to weigh other factors present in our case,

8

including the patent transfer agreement's preservation of "Existing Encumbrances" and other constraints on Lone Star's litigation and licensing activities, discussed further below.

*Second*, like the transferor in *Diamond Coating*, AMD retained significant control over Lone Star's activities. In addition to the "Existing Encumbrances" preserved by Section 2.3 of the patent transfer agreement, Section 2.6 conditioned any transfer of the "Assigned Patents" on bundling of said patents, the successor-in-interest's agreement to be bound by the patent transfer agreement, and AMD's written consent. Section 2.6 did specify that AMD could not "unreasonably" withhold its consent but did not further explain what "unreasonable" meant. Sections 6.2(f) and 3.3(c) also limited all of Lone Star's enforcement capabilities to specific targets listed in Exhibit E and conditioned any expansion of that list on AMD's agreement, with AMD could grant or deny in its "sole discretion." These terms are not identical to but, taken as a whole, are at least as restrictive as those examined in *Diamond Coating*.

Lone Star cites three decisions for the proposition that Section 2.6 does not defeat the purported "assignment" here. None of those decisions, however, examined restrictions like those set by Section 2.6, let alone a whole body of terms comparable to the patent transfer agreement here. *See Rude v. Westcott*, 130 U.S. 152, 163 (1889) ("absolute transfer of title" reserved "no control over the patents or their use or disposal, or any power to interfere with the management of the business growing out of their ownership"); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251–52 (Fed. Cir. 2000) (consent requirement to transfer did not significantly curtail rights of licensee free from existing encumbrances, prior practice rights, and restrictions on enforcement); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 874–75 (Fed. Cir. 1991) (grant of exclusive practice and enforcement rights constituted assignment despite retention of a veto right on sublicensing, the right to obtain foreign patents on the invention, termination provisions "consistent with an assignment," and a right to receive infringement damages). Again, *Diamond Coating* remains the better authority on our facts.[3]

---

[3] The issues examined in *Diamond Coating* suffice to decide the standing issue here, but it merits mention that AMD's right to 35–50 percent of Lone Star's "monetization efforts" — a factor not discussed in *Diamond Coating* — further belies the notion that Lone Star received "all substantial rights" in the patents. *See Mann*, 604 F.3d at 1360–61.

9

Lone Star further contends Section 6.2(f) is immaterial here because, even if Lone Star lacks standing to sue on the patents-in-suit *in general*, it still has standing to sue the *specific* defendants herein since they are all listed as targets on Exhibit E to the patent transfer agreement. This argument ignores that, *even as to the specific targets listed on Exhibit E*, Lone Star's enforcement and licensing capabilities remain subject to the "Existing Encumbrances" and restrictions on alienation set forth in Sections 2.3 and 2.6, respectively. Even assuming for the sake of argument that, as Lone Star urges, standing should be determined on a defendant-by-defendant basis, that general proposition would not suffice to create standing for Lone Star here.

In support of its position, Lone Star also cites *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266–67 (Fed. Cir. 2010), for the proposition that, "[d]epending on the scope of its exclusionary rights, an exclusive licensee may have standing to sue some parties and not others. . . . [I]f an exclusive licensee has the right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated." But *WiAV* examined the standing of *exclusive licensees* to sue based on their *exclusionary rights*, not the standing of *assignees* to sue based on receipt of *all substantial rights* in the patents-in-suit. The question here is not merely whether or not Lone Star received *exclusionary rights* but whether or not Lone Star received *all substantial rights* in the patents-in-suit. To repeat, Lone Star's complaints alleged only that it is an "assignee" and "sole owner" of the patents-in-suit. It cannot simply retreat to the position of an "exclusive licensee" to evade arguments that it did not actually receive "all substantial rights" in the patents-in-suit.

In a similar vein, Lone Star requests in the alternative that, if it is not an "assignee" and "sole owner" of the patents-in-suit, it be granted leave to join AMD as a party. Defendants counter-propose that these actions be dismissed without prejudice so that Lone Star can re-file if it can allege sufficient facts to state a claim as an exclusive licensee and secure AMD as a co-plaintiff. Defendants point out that Lone Star's delay in producing the crucial patent transfer agreement already prejudiced defendants' ability to litigate effectively because, without AMD, defendants had to move to transfer these actions to our district from the Eastern District of

10

Texas. Additionally, defendants have not been able to leverage their own patent portfolios to resolve this dispute because Lone Star, unlike AMD, is a non-practicing entity immune from the threat of counterclaims. Moreover, if AMD simply joins at this stage, Lone Star and AMD would enjoy earlier filing dates for their claims than defendants would for any counterclaims for purposes of recovering damages. *See* 35 U.S.C. § 286 ("Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."). This would be a manifestly unfair outcome given that Lone Star itself prevented defendants from asserting counterclaims earlier by failing to timely produce the patent transfer agreement.

This order agrees with defendants that allowing Lone Star to simply add AMD in at this stage would reward Lone Star for its litigation gimmick and unfairly prejudice defendants. Accordingly, these actions are hereby dismissed. Lone Star will have the option to re-file its claims as an "exclusive licensee" with AMD as a co-plaintiff, though this order in no way decides the separate question of whether or not Lone Star could sustain such claims under the applicable law. To be clear, if Lone Star re-files, it will not be allowed to take advantage of the earlier filing dates in the instant actions for purposes of recovering damages.

## CONCLUSION

To the foregoing extent, defendants' motions to dismiss are **GRANTED**. The above-captioned actions are **DISMISSED**. The Clerk shall please **CLOSE THE FILES**.

**IT IS SO ORDERED.**

Dated: January 20, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

11