Jon A. Birmingham (CA SBN 271034)
**FITCH, EVEN, TABIN & FLANNERY LLP**
21700 Oxnard Street, Suite 1740
Woodland Hills, California 91367
Telephone: (818) 715-7025
Facsimile: (818) 715-7033
Email: jbirmi@fitcheven.com

Timothy P. Maloney (*admitted pro hac vice*)
tpmalo@fitcheven.com
Joseph F. Marinelli (*admitted pro hac vice*)
jmarinelli@fitcheven.com
David A. Gosse (*admitted pro hac vice*)
dgosse@fitcheven.com
**FITCH, EVEN, TABIN & FLANNERY LLP**
120 South LaSalle Street, Suite 2100
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

*Attorneys for Plaintiff,*
LONE STAR SILICON INNOVATIONS LLC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| LONE STAR SILICON INNOVATIONS LLC, | Case No.: 3:17-cv-04032-WHA |
| Plaintiff, | |
| v. | |
| NANYA TECHNOLOGY CORPORATION, NANYA TECHNOLOGY CORPORATION U.S.A., NANYA TECHNOLOGY CORPORATION DELAWARE, and ADVANCED MICRO DEVICES, INC., | **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff, Lone Star Silicon Innovations LLC ("Lone Star"), complains against Defendants Nanya Technology Corporation, Nanya Technology Corporation, U.S.A., and Nanya Technology Corporation Delaware (individually or collectively, "the Nanya Defendants"), and Advanced Micro Devices, Inc. (together, "Defendants") as follows:

## NATURE OF ACTION

1.    This is an action for patent infringement of United States Patent Nos. 6,097,061, and 6,388,330 (collectively, the "Patents in Suit") under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

## THE PARTIES

2.    Plaintiff Lone Star is a corporation organized and existing under the laws of the State of Texas with its principle place of business at 8105 Rasor Blvd., Suite 210, Plano, TX 75024. Lone Star is in the business of licensing patented technology.

3.    Defendant Nanya Technology Corporation ("Nanya") is a corporation incorporated under the laws of Taiwan with its principal place of business at Hwa Ya Technology Park, 669 Fu Hsing 3rd Road, KueiShan, TaoYuan 333, Taiwan. Defendant Nanya conducts business in and is doing business in California and in this District and elsewhere in the United States, including, without limitation, using, promoting, offering to sell, importing and/or selling memory devices and/or devices that incorporate memory devices that embody the patented technology, and enabling end-user purchasers to use such devices in this District.

4.    Defendant Nanya Technology Corporation, U.S.A. ("Nanya USA") is a corporation organized under the laws of the state of California with its principal place of business at 1735 Technology Dr., Suite 400, San Jose, California 95110. Nanya USA's registered agent for service of process in the State of California is Business Filings Incorporated, located at 818 West Seventh Street, Suite 930, Los Angeles, California 90017. Upon information and belief, Nanya USA is a wholly-owned subsidiary of Nanya. Nanya USA supports Nanya's original equipment manufacturers ("OEM") business in the United States with local sales and technical support offices in San Jose, California. These local sales and technical support offices support the sales, product marketing, quality assurance, and logistics operations of Nanya in the United States. Nanya USA also has a network of manufacturer representatives and distributors

across the United States to support customers. Nanya USA has also established warehouse locations in the United States. Defendant Nanya USA conducts business in and is doing business in California, and in the District, and elsewhere in the United States, including, without limitation, using, promoting, offering to sell, importing and/or selling memory devices and/or devices that incorporate memory devices that embody patented technology, and enabling end-user purchasers to use such devices in this District.

5. Defendant Nanya Technology Corporation Delaware ("Nanya Delaware") is a corporation organized under the laws of the state of Delaware with principal places of business at 5104 Old Ironside Drive, Suite 113, Santa Clara, California 95054, and 108 West 13th Street, Wilmington, Delaware 19801. Nanya Delaware's registered agent for service of process in the State of California is C T Corporation System, 818 West Seventh Street, Suite 930, Los Angeles CA 90017. Upon information and belief, Nanya Delaware is a wholly-owned subsidiary of Nanya. Defendant Nanya Delaware conducts business in and is doing business in California and in the District and elsewhere in the United States, including, without limitation, using, promoting, offering to sell, importing and/or selling memory devices and/or devices that incorporate memory devices that embody patented technology, and enabling end-user purchasers to use such devices in this District.

6. Upon information and belief, Nanya controls and is the majority owner of the other Nanya Defendants, and the Nanya Defendants are joint tortfeasors with one another with respect to the matters alleged herein.

7. Advanced Micro Devices, Inc. ("AMD") is a corporation organized and existing under the law of the State of Delaware, and maintains its principal place of business at One AMD Place, Sunnyvale, California 94085.

8. As alleged in more detail below, AMD previously transferred rights in the Patents in Suit to Lone Star pursuant to a Patent Transfer Agreement effective August 4, 2016, which was amended on or about November 23, 2016, a copy of which is attached as Exhibit 1 (collectively "the Patent Transfer Agreement"). The rights transferred to Lone Star included "all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of" the Patents in Suit. The Court previously held that Lone Star lacked sufficient rights to bring suit against the Nanya Defendants without AMD, and dismissed the action without prejudice. (Dkt. No. 93, January 20, 2018 Order). Limestone appealed the

1   decision of the Court to Federal Circuit, arguing that it had all substantial rights to the Patent in Suit, and,

2   alternatively, that if it did not that it did not have all substantial rights to the Patents in Suit then it should

3   be allowed join AMD. The Federal Circuit held that Lone Star did not have all substantial rights under the

4   Patents in Suit and that some of the substantial rights were held by AMD. *Lone Star Silicon Innovations*

5   *LLC v. Nanya Tech. Corp et al.*, 925 F.3d 1225, 1229–34 (Fed. Cir. 2019). The Federal Circuit vacated

6   the decision of the Court to dismiss this action, and remanded the case with instructions that Lone Star be

7   permitted an opportunity to join AMD under Fed. R. Civ. P. 19(a). *Id.* at 1236–1239. The Federal Circuit

8   instructed the Court to consider whether AMD's joinder is feasible and, "[i]f so, then AMD must be

9   joined— involuntarily if need be." *Id.* at 1236.

10   9.      In view of the rulings of this Court and of the Federal Circuit that AMD holds some

11   substantial rights in the Patents in Suit, AMD should be joined as a required party to this action. AMD has

12   an implied legal obligation to Lone Star to allow its name to be used as joined co-plaintiff in order to

13   assure that Lone Star can enforce the rights granted to Lone Star under the Patent Transfer Agreement.

14   Lone Star requested that AMD join this action as a plaintiff, but AMD declined that request and has

15   refused to voluntarily join as a plaintiff. Joining AMD is feasible because AMD is subject to service of

16   process and to personal jurisdiction in this Court, and such joinder would not divest the Court of subject

17   matter jurisdiction and would not make venue improper.

18   10.     Rule 19(a)(2) permits joining AMD as a defendant or as an involuntary plaintiff. Under the

19   "primary purpose" test applied in the Ninth Circuit, a district court should align those parties whose

20   interests coincide respecting the primary matter in dispute. Realignment of AMD as a plaintiff is

21   appropriate because the primary matter in dispute is infringement and validity of the Patents in Suit and

22   Lone Star's request for infringement damages. The interests of AMD and Lone Star coincide with respect

23   to the primary matter in dispute because AMD is the original owner of the Patents in Suit, is a party to the

24   Patent Transfer Agreement, and has a contingent financial interest in any recovery.

25   ## JURISDICTION AND VENUE

26   11.     On October 7, 2016, Lone Star initiated this action against the Nanya Defendants under the

27   Patent Laws of the United States, Title 35 of the United States Code in the District Court for the Eastern

28   District of Texas. On February 28, 2017, the Nanya Defendants moved to transfer venue to this District.

1    Case 2:16-cv-01117-JRG-RSP, Docket No. 17. On May 22, 2017, the Supreme Court decided *TC*

2    *Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S.Ct. 1514 (2017). On June 19, 2017, in light of

3    the *TC Heartland* decision, Lone Star conceded to transfer the action to this District. On July 14, 2017,

4    the District Court for the Eastern District of Texas transferred the action to this District. This Court has

5    subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6         12.    Nanya USA is subject to personal jurisdiction in this Court because it has an established

7    place of business in this District and is incorporated under the laws of the State of California. Nanya

8    Delaware consented to jurisdiction and venue in this District for purposes of this case. Case No. 2:16-cv-

9    01117-JRG-RSP, Docket No. 17 ("NTC Delaware consents to jurisdiction in the Northern District of

10   California for purposes of this lawsuit only.") On information and belief, the Nanya Defendants are also

11   subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the

12   California Long Arm Statute, due at least to their substantial business conducted in this forum, directly

13   and/or through intermediaries, including (i) having solicited business in the State of California, having

14   transacted business within the State of California, and having attempted to derive financial benefit from

15   residents of the State of California, including benefits directly related to the instant patent infringement

16   causes of action set forth herein; (ii) having placed their products and services into the stream of commerce

17   throughout the United States and having been actively engaged in transacting business in California and

18   in this District; and (iii) either alone or in conjunction with others, having committed acts of infringement

19   within California and in this District. On information and belief, within this district the Nanya Defendants,

20   directly and/or through intermediaries, have advertised (including through websites), offered to sell, sold

21   and/or distributed infringing products, and/or have induced the sale and use of infringing products in the

22   United States and in California. The Nanya Defendants have, directly or through their distribution

23   network, purposefully and voluntarily placed such products in the stream of commerce knowing and

24   expecting them to be purchased and used by consumers in California. The Nanya Defendants have either

25   committed direct infringement in California or committed indirect infringement based on acts of direct

26   infringement in California and from Nanya USA's location in San Jose, California. Further, on

27   information and belief, the Nanya Defendants are subject to the Court's general jurisdiction, including

28   from regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or

deriving substantial revenue from goods and services provided to individuals in California and in this District.

13.     On information and belief, the Nanya Defendants do one or more of the following with memory devices and/or devices that incorporate memory devices that embody the patented technology that they or their foundries manufacture: (a) make these devices in the United States for sale to customers, including customers in California; (b) import these devices into the United States for sale to consumers, including consumers in California; (c) sell them or offer them for sale in the United States, including to customers in California; and/or (d) sell them to customers who incorporate them into products that such customers import, sell, or offer for sale in the United States, including in California.

14.     AMD is subject to personal jurisdiction in this Court because it has an established place of business in this District. On information and belief, AMD is also subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the California Long Arm Statute, due at least to its substantial business conducted in this forum, directly and/or through intermediaries, including (a) having solicited business in the State of California, having transacted business within the State of California, and having attempted to derive financial benefit from residents of the State of California; (b) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in California and in this District; and (c) having consented to jurisdiction and venue in the United States District Court for the Northern District of California with respect to all civil actions or other legal proceedings directly arising between the Lone Star and AMD under the Patent Transfer Agreement.

15.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391 and 1400. Defendant Nanya USA is subject to personal jurisdiction in this District, has a regular and established place of business within this District, resides in this District, and has committed acts of infringement within this District. Defendant Nanya Delaware consented to venue in this District. In addition, venue is proper in this District for Defendant Nanya pursuant to 28 U.S.C. § 1391(c)(3) because it is not resident in the United States, and therefore may be sued in any federal judicial district. Venue is proper in this District as to AMD under 28 U.S.C. §§ 1391 and 1400 because it is subject to personal jurisdiction in this District and resides in this District.

**THE PATENTS IN SUIT**

16.     On August 1, 2000, U.S. Patent No. 6,097,061 ("the '061 patent"), entitled "Trenched Gate Metal Oxide Semiconductor Device And Method," a copy of which is attached hereto as Exhibit 2, was duly and legally issued. The '061 patent issued from U.S. patent application Serial Number 09/052,051 filed December March 30, 1998 and discloses and relates to the design of and processes for fabricating semiconductor transistor devices.

17.     In an assignment recorded in the United States Patent Office Reel/Frame 009083/0052 on March 30, 1998, the inventors of the inventions contained in the '061 patent assigned all right, title, and interest in the '061 patent and all inventions contained therein to AMD. An assignment recorded in the United States Patent Office on August 5, 2016, Reel/Frame 039597/0957, indicates that AMD assigned "all of [its] entire right, title and interest in and to" the '061 patent to Lone Star, including all rights "in and to causes of actions and enforcement rights" and "all rights to pursue damages, injunctive relief and other remedies for past, present and future infringement of" the '061 patent. The assignment of the '061 patent from AMD to Lone Star was made subject to the terms and conditions of the Patent Transfer Agreement (which was inadvertently referenced as a Confidential Purchase and Sale Agreement in the recorded assignment document). Lone Star has the right to sue the Nanya Defendants for infringement and collect past, present, and future damages and to seek and obtain injunctive or any other relief for infringement of the '061 patent.

18.     The validity of the '061 patent was challenged before the United States Patents and Trademark Office in *inter partes* review proceedings numbered: IPR2017-01562 and IPR2018-00063. In IPR2017-01562, claims 1, 3–6, 11, and 13–16 of the '061 patent were found to be invalid. In IPR2018-00063, claims 1, 3, 4, 11, 13, and 14 of the '061 patent were found to be invalid. Lone Star has appealed each of these decisions to the Federal Circuit in Appeal Nos. 19-1556 and 19-2152.

19.     On May 14, 2002, U.S. Patent No. 6,388,330 ("the '330 patent"), entitled "Low Dielectric Constant Etch Stop Layers In Integrated Circuit Interconnects," a copy of which is attached hereto as Exhibit 3, was duly and legally issued. The '330 patent issued from U.S. patent application Serial Number 09/776,012 filed February 1, 2001 and discloses and relates to the design of and processes for fabricating semiconductor devices.

20.     In an assignment recorded in the United States Patent Office on February 2, 2001, Reel/Frame 011530/0755, the inventors of the inventions contained in the '330 patent assigned all right, title, and interest in the '330 patent and all inventions contained therein to AMD. An assignment recorded in the United States Patent Office on August 5, 2016, Reel/Frame 039597/0957, indicates that AMD assigned "all of [its] entire right, title and interest in and to" the '330 patent to Lone Star, including all rights "in and to causes of actions and enforcement rights" and "all rights to pursue damages, injunctive relief and other remedies for past, present and future infringement of" the '330 patent. The assignment of the '330 patent from AMD to Lone Star was made subject to the terms and conditions of the Patent Transfer Agreement (which was inadvertently referenced as a Confidential Purchase and Sale Agreement in the recorded assignment document). Lone Star has the right to sue the Nanya Defendants for infringement and collect past, present, and future damages and to seek and obtain injunctive or any other relief for infringement of the '330 patent.

21.     The validity of the '330 patent was challenged before the United States Patents and Trademark Office in *inter partes* review proceedings numbered: IPR2017-01566, IPR2017-01869, IPR2018-00062, and IPR2018-00087. Each of those *inter partes* review proceedings were instituted and each proceeded to a final written decision except IPR2018-00087 which was terminated prior to entry of a final written decision. In IPR2017-01566, claims 1, 2, 5–7, and 10 were found to be invalid. Lone Star has appealed that decision to the Federal Circuit (Appeal No. 19-1669) with respect to claim 2. In IPR2017-01869 claims 1, 4–6, 9, and 10 were found to be invalid. In IPR2018-00062 claims 1, 5, 6, and 10 were found to be invalid. In both IPR2017-01869 and IPR2018-00062, claim 2 was not shown to be invalid. Nanya has appealed the Board's final written decision in IPR2018-00062, with respect to claim 2, to the Federal Circuit (Appeal No. 19-2030). The Board's final written decision in IPR2017-01869, with respect to claim 2, was not appealed.

## LONE STAR'S STANDING TO BRING THIS LAWSUIT

22.     Lone Star and AMD have standing to bring this action because together they possess all substantial rights to the Patents in Suit.

23.     The Patent Transfer Agreement refers interchangeably to "Listed Patents" (see Exhibit A thereof) and "Assigned Patents" (see Exhibit B thereof). The Patents in Suit are included among the Listed

Patents and the Assigned Patents. The Patent Transfer Agreement includes a representation that AMD, or one of its Affiliates, has good and marketable title to each Listed Patent, "including all rights, title, and interest in each such Listed Patent and the right to sue for past, present and future infringement thereof," and is the original assignee of the Listed Patents. (Ex. 1, §§ 6.1(b)(i) and (ii).) The Patent Transfer Agreement purports to assign to Lone Star "all right, title and interest in, to and under the Assigned Patents" including "any and all legal rights entitled by [AMD] and all rights of AMD to sue for past, present and future infringement of any and all of the Assigned Patents." (Ex. 1, § 2.1.) The Patent Transfer Agreement also states that AMD assigned to Lone Star "all right, title and interest in, to and under all causes of action and enforcement rights, whether known, unknown, currently pending, filed, or otherwise, for the Assigned Patents, including all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of the Assigned Patents." (Ex. 1, § 2.2.) Lone Star also received all rights "to collect royalties under such Assigned Patents, to prosecute all existing Assigned Patents worldwide, to apply for additional Assigned Patents worldwide and to have Assigned Patents issue in the name of Lone Star." (Ex. 1, § 2.1.)

24.     As consideration for assigning the Assigned Patents to Lone Star, AMD is entitled to deferred compensation in the form of "Contingent Payments" based on any proceeds generated by Lone Star's patent enforcement and licensing efforts. (Ex. 1 at § 5.1.)

25.     Pursuant to the Patent Transfer Agreement and as part of the consideration provided to AMD, Lone Star contractually granted a non-exclusive license back to AMD, effective as of the Effective Date. The rights granted to AMD include, inter alia, the right to make, offer for sale and sell AMD products covered by the Assigned Patents. (Ex. 1, § 4.1.)

26.     The Patent Transfer Agreement acknowledges that the Assigned Patents are subject to certain pre-existing rights previously extended directly or indirectly by AMD to certain third parties, and reflects the parties' commitment to respect those rights. These are defined as "Existing Encumbrances," which may include, for example, pre-existing patent licenses, covenants not to sue, releases for past infringement granted by AMD, and pre-existing commitments relating to AMD's activities in standardization activities or patent pool activities. (Ex. 1, § 1.) Lone Star acknowledged that the Assigned

1   Patents are subject to these Existing Encumbrances, and "commit[ted] to comply with such Existing

2   Encumbrances. . . ." (Ex. 1, § 2.3.)

3       27.   The Patent Transfer Agreement includes a list of "Unlicensed Third Party Entities" that are

4   "not authorized or otherwise granted any rights (other than potentially by an implied license running with

5   [AMD's] Licensed Products) by AMD to the Assigned Patents to use, develop, copy, modify, import,

6   make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer

7   and/or otherwise exploit or dispose of a product or service by the Unlicensed Third Party Entity." (Ex. 1,

8   § 1 and Exhibit E.) AMD further represented and warranted that to its knowledge, none of the Unlicensed

9   Third Party Entities have been granted any rights under the Assigned Patents by AMD or its Affiliates.

10  (Ex. 1, § 6.1(b)(vii).) The Nanya Defendants each qualify as an Unlicensed Third Party Entity.

11      28.   As additional consideration, Lone Star further contractually agreed to provide notice to

12  AMD in the event that Lone Star decided not to pay a renewal, annuity, or maintenance fee on any

13  Assigned Patent, and to assign such patent back to AMD or AMD's chosen designee upon AMD's request.

14  (Ex. 1, § 3.4.) This clause of the Patent Transfer Agreement is of no legal or practical effect on the

15  Assigned Patents because, as of the Effective Date, all maintenance fees had already been paid for the full

16  remaining life of the patents.

17      29.   For the purpose of protecting AMD's interest in Contingent Payments, Lone Star also

18  agreed that it would not transfer its ownership of any Assigned Patents unless all such patents are

19  transferred collectively, the proposed assignee agrees in writing (with copy to AMD) to be bound by the

20  Patent Transfer Agreement as Lone Star's successor-in-interest, and AMD provides its written consent to

21  the transfer, "which shall not be unreasonably withheld." (Ex. 1, § 2.6.)

22      30.   The Federal Circuit confirmed that the Patent Transfer Agreement gave Lone Star

23  constitutional standing to bring this suit. *Lone Star Silicon Innovations LLC*, 925 F.3d 1225 at 1235. As

24  such, Lone Star holds the status of an exclusive licensee of the Patents in Suit for the purpose of standing

25  and has standing to bring this action against the Nanya Defendants with AMD joined as a co-plaintiff. As

26  the transferor of substantial exclusionary rights in the Patents in Suit to Lone Star and the holder of a

27  contractual financial interest in the damages relief sought herein and of other contractual warranties and

28  covenants extended by Lone Star, AMD has been joined to assure that principles of prudential standing

1   are satisfied to enable Lone Star to secure the relief sought herein. As alleged above, AMD must be joined

2   as a co-party because such joinder is feasible.

3   **THE NANYA DEFENDANTS' INFRINGING PRODUCTS AND METHODS**

4   31.   The Nanya Defendants make, use, sell, offer for sale and/or import into the United States

5   DRAM memory semiconductor devices and products incorporating these devices. These products are

6   high-density, random access memory devices that provide high-speed data storage and retrieval. The

7   Nanya Defendants' DRAM memory devices include computing DRAM products, consumer DRAM

8   products, mobile RAM products, and Elixir Notebook or Desktop memory cards. The devices are provided

9   as wafers and chips, and are integrated as components of personal computer memories, mobile device

10  memories, networking devices, servers, digital home appliances, consumer electronics, communications

11  equipment, computer peripherals, automotive systems and other applications. The Nanya Defendants'

12  LPDDR products offer lower power consumption relative to other DRAM products and are used in mobile

13  phones, tablets, embedded applications, ultra-thin laptop computers and other mobile consumer devices

14  that require low power consumption. Despite not having a license to the '330 or '061 patents, the Nanya

15  Defendants DRAM memory products adopt the designs claimed in these patents.

16  **FIRST CAUSE OF ACTION – INFRINGEMENT OF THE '061 PATENT**

17  32.   Plaintiff hereby repeats and re-alleges the allegations contained in paragraphs 1 to 31, as if

18  fully set forth herein.

19  33.   The Nanya Defendants, directly and/or through their subsidiaries, affiliates, agents, and/or

20  business partners, have in the past and continue to directly infringe the '061 patent pursuant to 35 U.S.C.

21  § 271(a) by making, using, selling, offering to sell and/or importing DRAM memory semiconductor

22  devices that embody the inventions claimed in the '061 patent, within the United States and within this

23  District, including at least claims 1, 3, 4, 11, 13 and 14. In violation of the '061 patent, Nanya Defendants'

24  accused DRAM memory devices include: (a) a semiconductor substrate of a first conductivity type; (b) a

25  source region of a second conductivity type in the semiconductor substrate; (c) a drain region of the second

26  conductivity type spaced from the source region in the semiconductor substrate; (d) a trench having

27  substantially upright vertical surfaces and a bottom surface formed in the semiconductor substrate

28  intermediate the source and drain regions; (e) a channel region formed in the semiconductor substrate and

1    forming a contiguous region beneath the bottom surface of the trench and immediately contiguous to the

2    source and drain regions; (f) a trench-to-gate insulating layer formed on the substantially upright vertical

3    surfaces and the bottom surface inside the trench and forming a contiguous layer inside the trench; and

4    (g) a trenched gate electrode having a top surface and formed on the trench-to-gate insulating layer inside

5    the trench.

6        34.    The Nanya Defendants have been and are engaged in one or more of these direct infringing

7    activities related to their DRAM memory semiconductor devices, including at least their computing

8    DRAM products (e.g., part numbers beginning in "NT256," "NT512," "NT1G," "NT2G," "NT4G,"

9    "NT8G," "NT16T," "NT32T"), including DDR2 SDRAM and DDR3 SDRAM; consumer DRAM

10   products (e.g., part numbers beginning in "NT5"), including any of the DDR, DDR2, DDR3, DDR4 chips

11   configured in Commercial Grade, Industrial Grade, or Automotive Grade; mobile RAM products (e.g.,

12   part numbers beginning in "NT6"), including any of the Mobile LPSDR, Mobile LPDDR, Mobile

13   LPDDR2, Mobile LPDDR3 chips; and Elixir Notebook or Desktop memory cards, including DDR3

14   SDRAM SODIMM (e.g., products with part numbers beginning with M2S4G64C or M2S8G64C), DDR3

15   SDRAM Unbuffered DIMM (e.g., products with part numbers beginning with M2F4G64C, M2X4G64C,

16   M2F8G64C, M2X8G64C); and any other DRAM memory devices of substantially similar design ("the

17   '061 Accused DRAM Products").

18       35.    The Nanya Defendants, directly and/or through their subsidiaries, affiliates, agents, and/or

19   business partners, have been and are now indirectly infringing the '061 patent under 35 U.S.C. § 271(b)

20   by actively inducing acts of direct infringement performed by others, including at least claims 1, 3, 4, 11,

21   13 and 14. The Nanya Defendants have actual notice of the '061 patent and the infringement alleged herein

22   at least upon the service of the original Complaint in this action. Upon information and belief, the Nanya

23   Defendants have numerous lawyers and other active agents of the Nanya Defendants and of their owned

24   and controlled subsidiaries who regularly review patents and published patent applications relevant to

25   technology in the fields of the Patents in Suit, specifically including patents directed to semiconductor

26   memory devices issued to competitors such as AMD, the original assignee of the '061 patent. Upon

27   information and belief, Nanya itself has been issued over 500 patents, including dozens of patents

28   prosecuted in the USPTO in the same classifications as the '061 patent, giving the Nanya Defendants

1    intimate knowledge of the art in fields relevant to this civil action. The timing, circumstances and extent

2    of the Nanya Defendants' obtaining actual knowledge of the '061 patent prior to the commencement of

3    this lawsuit will be confirmed during discovery.

4        36.    Upon gaining knowledge of the '061 patent, it was, or became, apparent to the Nanya

5    Defendants that the manufacture, sale, importing, offer for sale, and use of their '061 Accused DRAM

6    Products result in infringement of the '061 patent. Upon information and belief, the Nanya Defendants

7    have continued and will continue to engage in activities constituting inducement of infringement,

8    notwithstanding their knowledge, or willful blindness thereto, that the activities they induce result in

9    infringement of the '061 patent.

10       37.    The '061 Accused DRAM Products are intended for integration into products known to be

11   sold widely in the United States. The Nanya Defendants make DRAM semiconductor devices that embody

12   the inventions claimed in the '061 patent, and those devices infringe when they are imported into, or sold,

13   used, or offered for sale in, the United States. The Nanya Defendants indirectly infringe by inducing

14   customers (such as makers of mobile devices, desktop computers and other devices that use DRAM

15   memory) to import products that integrate DRAM semiconductor devices embodying inventions claimed

16   in the '061 patent, or to sell or use such products, or offer them for sale, in the United States. For example,

17   the Nanya Defendants induce third-party manufacturers, OEMs, importers, resellers, and other customers

18   who purchase devices manufactured at the Nanya Defendants' overseas facilities, or supplied under

19   agreements with partner foundries, to import devices embodying inventions claimed in the '061 patent, or

20   to sell or use such devices, or offer them for sale in the United States without authority.

21       38.    The Nanya Defendants encourage customers, resellers, OEMs, or others to import into the

22   United States and sell and use in the United States the '061 Accused DRAM Products embodying

23   inventions claimed in the '061 patent with knowledge and the specific intent to cause the acts of direct

24   infringement performed by these third parties. On information and belief, after the Nanya Defendants

25   obtained knowledge of the '061 patent, the '061 Accused DRAM Products have been and will continue

26   to be imported into the United States and sold in large volumes by them and by others, such as customers,

27   distributors and resellers. The Nanya Defendants are aware that the '061 Accused DRAM Products are

28   integral components of the computer and mobile products incorporating them, that the infringing DRAM

Products are built into the computer and other products, and cannot be removed or disabled by a purchaser of the consumer products containing the infringing DRAM memory devices, such that the Nanya Defendants' customers will infringe one or more claims of the '061 patent by incorporating such DRAM semiconductor devices in other products, and that subsequent importation, sale, and use of such products in the United States would be a direct infringement of the '061 patent. Therefore, the Nanya Defendants are aware that their customers will infringe one or more claims of the '061 patent by selling, offering for sale, importing, and/or using the products as-sold and as-marketed by the Nanya Defendants.

39.    The Nanya Defendants directly benefit from and actively and knowingly encourage customers, resellers, and users' importation of these products into the United States and sale and use within the United States. The Nanya Defendants actively encourage customers and downstream users, OEMs, and resellers to import, use, and sell in the United States the '061 Accused DRAM Products that they manufacture and supply, including through advertising, marketing, and sales activities directed at United States sales. On information and belief, the Nanya Defendants are aware of the size and importance of the United States market for customers of the Nanya Defendants' products, and also distribute or supply these products intended for importation, use, and sale in the United States. The Nanya Defendants routinely market their infringing DRAM memory products to third parties for inclusion in products that are sold to customers in the United States, as well as directly to end user customers. Nanya has publicly stated that its DRAM products are primarily targeted for desktop computers, tablet computers, mobile phones, networking devices, servers, and other products, all of which are widely sold and used in the United States. The Nanya Defendants have numerous direct sales, distributors, and reseller outlets for these products in the United States. The Nanya Defendants' marketing efforts show that they have specifically intended to and have induced direct infringement in the United States.

40.    The Nanya Defendants also provide OEMs, manufacturers, importers, resellers, customers, and end users with instructions, user guides, and technical specifications on how to incorporate the '061 Accused DRAM Products into electronics products that are made, used, sold, offered for sale in, and/or imported into the United States. When OEMs, manufacturers, importers, resellers, customers, and end users follow such instructions, user guides, and technical specifications and embed the Nanya Defendants' products in end products and make, use, offer to sell, sell, or import into the United States, they directly

infringe one or more claims of the '061 patent. The Nanya Defendants know that by providing such instructions, user guides, and technical specifications, OEMs, manufacturers, importers, resellers, customers, and end users follow them, and therefore directly infringe one or more claims of the '061 patent. The Nanya Defendants thus know that their actions actively induce infringement.

41.     The Nanya Defendants have engaged and will continue to engage in additional activities to specifically target the United States market for the '061 Accused DRAM Products and actively induce OEMs, manufacturers, importers, resellers, customers, and end users to directly infringe one or more claims of the '061 patent in the United States. For example, the Nanya Defendants have set up a global sales network that includes the United States to encourage various OEMs, manufacturers, importers, resellers, customers, and end users to include their infringing technology in their computers, mobile devices, removable storage devices and other products. Defendant Nanya USA is responsible for the Nanya Defendants' sales and marketing activities in the United States.

42.     The Nanya Defendants derive significant revenue by selling the '061 Accused DRAM Products to third parties who directly infringe the '061 patent in the United States. The Nanya Defendants' extensive sales and marketing efforts, sales volume, and partnerships all evidence their intent to induce companies to infringe one or more claims of the '061 patent by using, offering to sell, selling, or importing products that incorporate the '061 Accused DRAM Products, in the United States. The Nanya Defendants have had specific intent to induce infringement or have been willfully blind to the direct infringement they are inducing.

43.     Upon information and belief, the Nanya Defendants have continued and will continue to engage in activities constituting contributory infringement of the '061 patent under 35 U.S.C. § 271(c), including at least claims 1, 3, 4, 11, 13 and 14. The Nanya Defendants contributorily infringe with knowledge that the '061 Accused DRAM Products, or the use thereof, infringe the '061 patent. The Nanya Defendants knowingly and intentionally contributed to the direct infringement of the '061 patent by others, by supplying these DRAM memory chipset products that embody a material part of the claimed invention of the '061 patent, and that are known by the Nanya Defendants to be specially made or adapted for use in an infringing manner. For example, and without limitation, the '061 Accused DRAM Products are used in end products, including computers, laptops, tablets, and mobile telephones. The '061 Accused DRAM

Products are not staple articles or commodities of commerce suitable for non-infringing use and are especially made for or adapted for use in infringing the '061 patent. There are no substantial uses of the '061 Accused DRAM Products that do not infringe the '061 patent. By contributing a material part of the infringing computing products sold, offered for sale, imported and used by their customers, resellers and users, the Nanya Defendants have been and are now indirectly infringing the '061 patent under 35 U.S.C. § 271(c).

44.     The Nanya Defendants' direct and indirect infringement of the '061 patent has injured Lone Star, and Lone Star is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless they cease their infringing activities, the Nanya Defendants will continue to injure Lone Star by infringing the '061 patent.

45.     On information and belief, The Nanya Defendants acted egregiously and with willful misconduct in that their actions constituted direct or indirect infringement of a valid patent, and this was either known or so obvious that the Nanya Defendants should have known about it. The Nanya Defendants continue to infringe the '061 patent by making, using, selling, offering for sale and importing in the United States the '061 Accused DRAM Products and to induce the direct infringement of others performing these acts, or they have acted at least in reckless disregard of Lone Star's patent rights. On information and belief, the Nanya Defendants will continue their infringement notwithstanding actual knowledge of the '061 patent and without a good faith basis to believe that their activities do not infringe any valid claim of the '061 patent. All infringement of the '061 patent following the Nanya Defendants' knowledge of the '061 patent is willful and Lone Star is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

## SECOND CAUSE OF ACTION – INFRINGEMENT OF THE '330 PATENT

46.     Plaintiff hereby repeats and re-alleges the allegations contained in paragraphs 1 to 31, as if fully set forth herein.

47.     The Nanya Defendants, directly and/or through their subsidiaries, affiliates, agents, and/or business partners, have in the past and continue to directly infringe the '330 patent pursuant to 35 U.S.C. § 271(a) by making, using, selling, offering to sell and/or importing DRAM memory semiconductor devices that embody the inventions claimed in the '330 patent, within the United States and within this

1 District, including at least claim 2. In violation of the '330 patent, the Nanya Defendants' accused DRAM

2 memory devices include: (a) a semiconductor substrate having a semiconductor device provided thereon;

3 (b) a first dielectric layer formed over the semiconductor substrate having a first opening; (c) a first

4 conductor core filling the first opening and connected to the semiconductor device; (d) an etch stop layer

5 of silicon nitride formed over the first dielectric layer and the first conductor core, the etch stop layer

6 having a dielectric constant below 5.5; (e) a second dielectric layer formed over the etch stop layer and

7 having a second opening open to the first conductor core; and (f) a second conductor core filling the second

8 opening and connected to the first conductor core. The Nanya Defendants further directly infringe the

9 '330 patent because, for example, their DRAM memory devices include: (g) an etch stop layer that is a

10 multilayer structure.

11        48.      The Nanya Defendants have been and are engaged in one or more of these direct infringing

12 activities related to their DRAM memory semiconductor devices, including at least their computing

13 DRAM products (e.g., part numbers beginning in "NT256," "NT512," "NT1G," "NT2G," "NT4G,"

14 "NT8G," "NT16T," "NT32T"), including DDR2 SDRAM and DDR3 SDRAM; consumer DRAM

15 products (e.g., part numbers beginning in "NT5"), including any of the DDR, DDR2, DDR3, DDR4 chips

16 configured in Commercial Grade, Industrial Grade, or Automotive Grade; mobile RAM products (e.g.,

17 part numbers beginning in "NT6"), including any of the Mobile LPSDR, Mobile LPDDR, Mobile

18 LPDDR2, Mobile LPDDR3 chips; and Elixir Notebook or Desktop memory cards, including DDR3

19 SDRAM SODIMM (e.g., products with part numbers beginning with M2S4G64C or M2S8G64C), DDR3

20 SDRAM Unbuffered DIMM (e.g., products with part numbers beginning with M2F4G64C, M2X4G64C,

21 M2F8G64C, M2X8G64C); and any other DRAM memory devices of substantially similar design ("the

22 '330 Accused DRAM Products").

23        49.      The Nanya Defendants, directly and/or through their subsidiaries, affiliates, agents, and/or

24 business partners, have been and are now indirectly infringing the '330 patent under 35 U.S.C. § 271(b)

25 by actively inducing acts of direct infringement performed by others. The Nanya Defendants have actual

26 notice of the '330 patent and the infringement alleged herein at least upon the service of the original

27 Complaint in this action, including at least claim 2. Upon information and belief, the Nanya Defendants

28 have numerous lawyers and other active agents of the Nanya Defendants and of their owned and controlled

1  subsidiaries who regularly review patents and published patent applications relevant to technology in the

2  fields of the Patents in Suit, specifically including patents directed to semiconductor memory devices

3  issued to competitors such as AMD, the original assignee of the '330 patent. Upon information and belief,

4  Nanya itself has been issued over 500 patents, including over a dozen patents prosecuted in the USPTO

5  in the same classifications as the '330 patent, giving the Nanya Defendants intimate knowledge of the art

6  in fields relevant to this civil action. The timing, circumstances and extent of the Nanya Defendants'

7  obtaining actual knowledge of the '330 patent prior to the commencement of this lawsuit will be confirmed

8  during discovery.

9       50.     Upon gaining knowledge of the '330 patent, it was, or became, apparent to the Nanya

10  Defendants that the manufacture, sale, importing, offer for sale, and use of their '330 Accused DRAM

11  Products result in infringement of the '330 patent. Upon information and belief, the Nanya Defendants

12  have continued and will continue to engage in activities constituting inducement of infringement,

13  notwithstanding their knowledge, or willful blindness thereto, that the activities they induce result in

14  infringement of the '330 patent under 35 U.S.C. § 271(b).

15       51.     The '330 Accused DRAM Products are intended for integration into products known to be

16  sold widely in the United States. The Nanya Defendants and their subsidiaries make DRAM

17  semiconductor devices that embody the inventions claimed in the '330 patent, and those devices infringe

18  when they are imported into, or sold, used, or offered for sale in, the United States. The Nanya Defendants

19  indirectly infringe by inducing customers (such as makers of mobile devices, desktop computers and other

20  devices that use DRAM memory) to import products that integrate DRAM semiconductor devices

21  embodying inventions claimed in the '330 patent, or to sell or use such products, or offer them for sale, in

22  the United States. For example, the Nanya Defendants induce third-party manufacturers, original

23  equipment manufacturers (OEMs), importers, resellers, and other customers who purchase devices

24  manufactured at Nanya's overseas facilities, or supplied under agreements with partner foundries, to

25  import devices embodying inventions claimed in the '330 patent, or to sell or use such devices, or offer

26  them for sale in the United States without authority.

27       52.     The Nanya Defendants encourage customers, resellers, OEMs, or others to import into the

28  United States and sell and use in the United States the '330 Accused DRAM Products embodying

1     inventions claimed in the '330 patent with knowledge and the specific intent to cause the acts of direct

2     infringement performed by these third parties. On information and belief, after the Nanya Defendants

3     obtained knowledge of the '330 patent, the '330 Accused DRAM Products have been and will continue

4     to be imported into the United States and sold in large volumes by them and by others, such as customers,

5     distributors and resellers. The Nanya Defendants are aware that the '330 Accused DRAM Products are

6     integral components of the computer and mobile products incorporating them, that the infringing DRAM

7     Products are built into the computer and other products, and cannot be removed or disabled by a purchaser

8     of the consumer products containing the infringing DRAM memory devices, such that the Nanya

9     Defendants' customers will infringe the asserted claim of the '330 patent by incorporating such DRAM

10     semiconductor devices in other products, and that subsequent importation, sale and use of such products

11     in the United States would be a direct infringement of the '330 patent. Therefore, the Nanya Defendants

12     are aware that their customers will infringe the asserted claim of the '330 patent by selling, offering for

13     sale, importing and/or using the products as-sold and as-marketed by the Nanya Defendants.

14         53.    The Nanya Defendants directly benefit from and actively and knowingly encourage

15     customers, resellers, and users' importation of these products into the United States and sale and use within

16     the United States. The Nanya Defendants actively encourage customers and downstream users, OEMs,

17     and resellers to import, use, and sell in the United States the '330 Accused DRAM Products that they

18     manufacture and supply, including through advertising, marketing, and sales activities directed at United

19     States sales. On information and belief, the Nanya Defendants are aware of the size and importance of the

20     United States market for customers of the Nanya Defendants' products, and also distribute or supply these

21     products intended for importation, use, and sale in the United States. Defendants routinely market their

22     infringing DRAM memory products to third parties for inclusion in products that are sold to customers in

23     the United States, as well as directly to end-user customers. The Nanya Defendants have publicly stated

24     that its DRAM products are primarily targeted for desktop computers, tablet computers, mobile phones,

25     networking devices, servers, and other products, all of which are widely sold and used in the United States.

26     The Nanya Defendants have numerous direct sales, distributors, and reseller outlets for these products in

27     the United States. The Nanya Defendants' marketing efforts show that they have specifically intended to

28     and have induced direct infringement in the United States.

54.     The Nanya Defendants also provide OEMs, manufacturers, importers, resellers, customers, and end users with instructions, user guides, and technical specifications on how to incorporate the '330 Accused DRAM Products into electronics products that are made, used, sold, offered for sale in, and/or imported into the United States. When OEMs, manufacturers, importers, resellers, customers, and end users follow such instructions, user guides, and technical specifications and embed the Nanya Defendants' products in end products and make, use, offer to sell, sell, or import into the United States, they directly infringe the asserted claim of the '330 patent. The Nanya Defendants know that by providing such instructions, user guides, and technical specifications, OEMs, manufacturers, importers, resellers, customers, and end users will follow them, and therefore directly infringe the asserted claim of the '330 patent. The Nanya Defendants thus know that their actions actively induce infringement.

55.     The Nanya Defendants have engaged and will continue to engage in additional activities to specifically target the United States market for the '330 Accused DRAM Products and actively induce OEMs, manufacturers, importers, resellers, customers, and end users to directly infringe the asserted claim of the '330 patent in the United States. For example, the Nanya Defendants have set up a global sales network that includes the United States to encourage various OEMs, manufacturers, importers, resellers, customers, and end users to include their infringing technology in their computers, mobile devices, removable storage devices, and other products. Defendant Nanya USA is responsible for the Nanya Defendants' sales and marketing activities in the United States.

56.     The Nanya Defendants derive significant revenue by selling the '330 Accused DRAM Products to third parties who directly infringe the '330 patent in the United States. The Nanya Defendants' extensive sales and marketing efforts, sales volume, and partnerships all evidence their intent to induce companies to infringe the asserted claim of the '330 patent by, using, offering to sell, selling, or importing products that incorporate the '330 Accused DRAM Products, in the United States. The Nanya Defendants have had specific intent to induce infringement or have been willfully blind to the direct infringement they are inducing.

57.     Upon information and belief, the Nanya Defendants have continued and will continue to engage in activities constituting contributory infringement of the '330 patent under 35 U.S.C. § 271(c), including at least claim 2. The Nanya Defendants contributorily infringe with knowledge that the '330

1   Accused DRAM Products, or the use thereof, infringe the '330 patent. The Nanya Defendants knowingly

2   and intentionally contributed to the direct infringement of the '330 patent by others, by supplying these

3   DRAM memory chipset products, that embody a material part of the claimed invention of the '330 patent,

4   that are known by the Nanya Defendants to be specially made or adapted for use in an infringing manner.

5   For example, and without limitation, the '330 Accused DRAM Products are used in end products,

6   including computers, laptops, tablets and mobile telephones. The '330 Accused DRAM Products are not

7   staple articles or commodities of commerce suitable for non-infringing use and are especially made for or

8   adapted for use in infringing the '330 patent. There are no substantial uses of the '330 Accused DRAM

9   Products that do not infringe the '330 patent. By contributing a material part of the infringing computing

10  products sold, offered for sale, imported and used by their customers, resellers and users, the Nanya

11  Defendants have been and are now indirectly infringing the '330 patent under 35 U.S.C. § 271(c).

12      58.   The Nanya Defendants' direct and indirect infringement of the '330 patent has injured Lone

13  Star, and Lone Star is entitled to recover damages adequate to compensate for such infringement pursuant

14  to 35 U.S.C. § 284. Unless they cease their infringing activities, The Nanya Defendants will continue to

15  injure Lone Star by infringing the '330 patent.

16      59.   On information and belief, the Nanya Defendants acted egregiously and with willful

17  misconduct in that their actions constituted direct or indirect infringement of a valid patent, and this was

18  either known or so obvious that the Nanya Defendants should have known about it. The Nanya Defendants

19  continue to infringe the '330 patent by making, using, selling, offering for sale and importing in the United

20  States the '330 Accused DRAM Products and to induce the direct infringement of others performing these

21  acts, or they have acted at least in reckless disregard of Lone Star's patent rights. On information and

22  belief, the Nanya Defendants will continue their infringement notwithstanding actual knowledge of the

23  '330 patent and without a good faith basis to believe that its activities do not infringe any valid claim of

24  the '330 patent. All infringement of the '330 patent following the Nanya Defendants' knowledge of the

25  '330 patent is willful and Lone Star is entitled to treble damages and attorneys' fees and costs incurred in

26  this action under 35 U.S.C. §§ 284 and 285.

27

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for:

1.      Judgment that the ʼ061, and ʼ330 patents are each valid and enforceable;

2.      Judgment that the ʼ061, and ʼ330 patents are infringed by the Nanya Defendants;

3.      Judgment that the Nanya Defendants' acts of patent infringement relating to the patents are willful;

4.      An award of damages arising out of the Nanya Defendants' acts of patent infringement, together with pre-judgment and post-judgment interest;

5.      Judgment that the damages so adjudged be trebled in accordance with 35 U.S.C. § 284;

6.      An award of Plaintiff's attorneys' fees, costs and expenses incurred in this action in accordance with 35 U.S.C. § 285; and

7.      Such other and further relief as the Court may deem just and proper.

## RESERVATION OF RIGHTS

Plaintiff's investigation is ongoing, and certain material information remains in the sole possession of Nanya Defendants or third parties, which will be obtained via discovery herein. Plaintiff expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

Respectfully,

Dated: September 19, 2019                FITCH, EVEN, TABIN & FLANNERY LLP

                                         */s/ Joseph F. Marinelli*
                                         Joseph F. Marinelli (admitted *pro hac vice*)

                                         *Attorney for Plaintiff*
                                         LONE STAR SILICON INNOVATIONS LLC

## JURY DEMAND

Plaintiff demands trial by jury of all issues triable of right by a jury.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: September 19, 2019

FITCH, EVEN, TABIN & FLANNERY LLP

/s/ Joseph F. Marinelli
Joseph F. Marinelli (admitted *pro hac vice*)

*Attorney for Plaintiff*
LONE STAR SILICON INNOVATIONS LLC

# Exhibit 1

**AMD bank account information redacted pursuant to April 5, 2018 Order (Case No. 18-01680-WHA, D.I. 40)**

**Confidential**

## PATENT TRANSFER AGREEMENT

This PATENT TRANSFER AGREEMENT (this **"Agreement"**) is entered into on August 4th, 2016 (the **"Effective Date"**), by and between Lone Star Silicon Innovations LLC, an entity organized under the laws of State of Texas having its primary place of business at 5204 Bluewater Drive, Frisco, TX 75034 . (**"Lone Star"**) and Advanced Micro Devices, Inc., a Delaware corporation (**"AMD"**). Lone Star and AMD are herein referred to separately as "a party" or collectively as "the parties."

## RECITALS

Whereas Lone Star wishes to acquire certain patents and patent applications owned by AMD; and

Whereas AMD is interested in selling such certain patents and patent applications to Lone Star while retaining a license and certain sub-license rights to such patents and patent applications;

Now therefore, in consideration of the mutual covenants and conditions stated herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as set forth herein.

## AGREEMENT

### 1.   DEFINITIONS

**"Affiliate"** means, with respect to a Person, any Person Controlling, Controlled by, or under common Control with such Person. A Person shall be deemed an Affiliate only so long as such Control exists.

**"Agreement"** shall have the meaning set forth in the introduction.

**"Alternate Forum"** shall have the meaning set forth in Section 7.1.

**"AMD"** shall have the meaning set forth in the introduction.

**"Assigned Patents"** means and includes all patents listed in **Exhibit A** hereto. In addition, "Assigned Patents" also includes the following to the extent owned and assignable by AMD: (i) all patents and patent applications listed in **Exhibit B** hereto, (ii) applications for the foregoing in all countries of the world, and (iii) any other procedure or formality with respect to the aforesaid that can result in an enforceable patent right anywhere in the world.

**"Assignment"** shall have the meaning set forth in Section 2.1.

**"Confidentiality and Common Interest Agreement"** means an agreement, in the form set forth on Exhibit D, setting forth the terms under which Lone Star and AMD will seek to protect certain information relating to the Assigned Patents as confidential and/or under the common interest privilege.

**"Control"** means, with respect to a Person, (a) direct or indirect ownership of more than fifty percent (50%) of the outstanding shares representing the right to vote for members of the board of directors or other managing officers of such Person, or (b) for a Person that does not have outstanding shares, more

than fifty percent (50%) of the direct or indirect ownership interest representing the right to make decisions for such Person.

"**Lone Star**" shall have the meaning set forth in the introduction.

"**Disclosure Schedule**" shall refer to the schedule of Exhibit F hereto.

"**Effective Date**" shall have the meaning set forth in the introduction.

"**Existing Encumbrances**" means, in relation to the Assigned Patents, (a) pre-existing patent licenses, covenants not to assert, promises or agreements to license, and/or similar patent immunities; (b) rights to renew or extend pre-existing patent licenses exercised unilaterally by third parties (such as legally binding options); (c) releases for past infringement; and/or (d) pre-existing commitments related to AMD's or its Affiliates' standardization activities or patent pool activities, and other pre-existing specification-related or standards-related licenses, covenants and promises of AMD or any of its Affiliates, which, in each of (a), (b), (c) and (d), shall transfer in connection with the transfer of the Assigned Patent(s) and/or which AMD or any of its Affiliates has committed to maintain in connection with the transfer of such Assigned Patent(s).

"**Former Affiliate**" shall have the meaning set forth in Section 4.1(b)(i)

"**Former Asset**" shall have the meaning set forth in Section 4.1(b)(ii).

"**Forum**" shall have the meaning set forth in Section 7.1.

"**Governmental Authority**" means any governmental agency or authority of the United States, any domestic state or any foreign country, and any political subdivision or agency thereof, and includes any authority having governmental or quasi-governmental powers, including any administrative agency or commission.

"**Grantee**" shall have the meaning set forth in Section 4.1(a).

"**Grantor**" shall have the meaning set forth in Section 4.1(a).

"**Knowledge**" shall have the meaning set forth in Section 6.1.

"**Law**" or "**law**" means all laws, statutes, ordinances, regulations and similar mandates of any Governmental Authority having the effect of law in any jurisdiction, including any judgment, order, decision, writ, injunction, ruling or decree of, or any settlement under the jurisdiction of, any court or Governmental Authority having the effect of law in each such jurisdiction.

"**Law Firm**" means Fitch, Even, Tabin & Flannery LLP, having its principal office at 120 S. LaSalle Street, Suite 1600, Chicago, IL 60603, or such other law firm as Lone Star may retain as its litigation counsel in enforcing, licensing or otherwise monetizing one or more of the Assigned Patents.

"**Licensed Products**" means, with respect to a Person, all of its software, hardware, products, designs, services, and activities.

"**Listed Patents**" means the patents and patent applications listed in Exhibit A hereto.

"**Person**" means any individual, person, trust, corporation, partnership, joint venture, limited liability

company, association, unincorporated organization, or any foreign counterpart of any of the foregoing, or any other legal or governmental entity or organization.

"**Proceeds**" means the receipt and/or collection of anything of value, including without limitation monies, property or compensation of any kind, or any other thing of value received by Lone Star by judgment, award, agreement, license or cross-license, patent sale, settlement, alternative dispute resolution or otherwise, directly or indirectly, in connection, directly or indirectly, with the monetization of the Assigned Patents without regard to any taxes, duties, levies, fees (contingent or otherwise), excises or tariffs imposed on any of Lone Star's activities in connection with this Agreement.

"**Unlicensed Third Party Entity**" means a Person (or an Affiliate thereof) which is not authorized or otherwise granted any rights (other than potentially by an implied license running with a Grantee's Licensed Products) by AMD to the Assigned Patents to use, develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of a product or service by the Unlicensed Third Party Entity. Unlicensed Third Party Entity shall be deemed to only include the Persons listed in Exhibit E and their Affiliates and all other Persons that the Parties agree in writing in the future to add to Exhibit E.

## 2. ASSIGNMENT OF PATENTS; COMPLIANCE WITH EXISTING ENCUMBRANCES

2.1     Patent Assignment. AMD shall, and hereby does, assign to Lone Star, and Lone Star hereby acquires and accepts from AMD all right, title and interest in, to and under the Assigned Patents on an "**AS IS**" basis, subject to section 6.1(b)(vii), including any and all inventions and discoveries claimed therein, any and all legal rights entitled by the original owner of the Assigned Patents and all rights of AMD to sue for past, present and future infringement of any and all of the Assigned Patents, to collect royalties under such Assigned Patents, to prosecute all existing Assigned Patents worldwide, to apply for additional Assigned Patents worldwide and to have Assigned Patents issue in the name of Lone Star.

2.2     Assignment of Causes of Action. AMD shall, and hereby does, assign to Lone Star, and Lone Star hereby acquires and accepts from AMD all right, title and interest in, to and under all causes of action and enforcement rights, whether known, unknown, currently pending, filed, or otherwise, for the Assigned Patents, including all rights to pursue damages, injunctive relief and other remedies for past, current and future infringement of the Assigned Patents. To the extent permissible by law, AMD shall, and hereby does, transfer all rights to assert any work product and attorney client privilege that relate exclusively to the prosecution and enforcement of the Assigned Patents and embodied by or contained in the prosecution history files transferred pursuant to Section 3.2.

2.3     Existing Encumbrances. Subject to section 6.1(b)(vii), the Assigned Patents are hereby assigned and transferred to Lone Star, and Lone Star hereby acquires and accepts from AMD, that the Assigned Patents are subject to the Existing Encumbrances and the license and other rights granted under Section 4, and Lone Star hereby commits to comply with such Existing Encumbrances and the license and other rights granted under Section 4, and to make any and every future sale, transfer, assignment, lien, mortgage or other encumbrance of the Assigned Patents subject to the Existing Encumbrances and the license and other rights granted under Section 4, and compliance therewith.

2.4     Additional Information. For the avoidance of doubt, any pre-existing patent license agreements or other agreements related to the Assigned Patents, including, without limitation, any related royalty payments, shall not be assigned or transferred to Lone Star. AMD hereby commits that it shall, at all times, use reasonable efforts to promptly provide Lone Star, at Lone Star's reasonable request, a description of the type of products and/or services that are or are not covered by any Existing Encumbrances that AMD or any of its Affiliates may be committed to with respect to any specific named

entity under the Assigned Patents, in each case subject to any confidentiality obligations AMD or any of its Affiliates may have under any Existing Encumbrances. If the information requested by Lone Star under this Section 2.4 is subject to non-disclosure obligations preventing disclosure to Lone Star, AMD and Lone Star shall negotiate in good faith and seek to identify a method for providing Lone Star with reasonable access to useful information without breaching any such confidentiality obligations.

2.5     Covenant of AMD. AMD, on behalf of itself and its Affiliates, covenants that it shall not commence, direct or control any legal action seeking to render any of the Assigned Patents invalid or unenforceable nor shall it assist others, directly or indirectly, to do any of the foregoing. However, responses to third party subpoenas, requests for information by a Governmental Authority or court orders shall not be considered assistance hereunder.

2.6     Patent Resale. Any assignment of an Assigned Patent in violation of this Section 2.6 shall be void ab initio. Lone Star will not transfer ownership of any of the Assigned Patents unless: (a) all Assigned Patents are transferred collectively; (b) the proposed successor-in-interest agrees to be bound by this Agreement (with the successor-in-interest taking the place of Lone Star for all purposes of this Agreement) including, but not limited to, obtaining ownership of any of the Assigned Patents subject to any and all Existing Encumbrances, in writing enforceable by AMD and with a copy provided to AMD; and (c)AMD provides its written consent to the transfer, which shall not be unreasonably withheld.

## 3.     DELIVERY AND POST-DELIVERY REQUIREMENTS

3.1     Executed Assignment and Confidentiality and Common Interest Agreement. On the Effective Date, AMD shall execute (i) an assignment (the "**Assignments**"), the form of which is attached hereto as Exhibit C, suitable for filing with the USPTO and other patent offices worldwide, and (ii) the Confidentiality and Common Interest Agreement, the form of which is attached hereto as Exhibit D. Lone Star shall promptly counter-sign and return the Confidentiality and Common Interest Agreement. The terms of the Confidentiality and Common Interest Agreement shall apply to the documents, files and information provided by AMD pursuant to Sections 2.4, 3.2 and 3.3 and the parties' discussions pursuant to Section 3.4 and any other similar provisions in this Agreement.

3.2     Delivery. Within sixty (60) days following the Effective Date, AMD shall, using reasonable commercial efforts, send via Federal Express or other reliable overnight and trackable delivery service, to Lone Star, the executed originals or certified copies of the Assignments along with all material, non-privileged files and documents in the possession of AMD regarding the Assigned Patents, which may include the following, to the extent available: (a) Letters Patents, (b) assignments for the Assigned Patents, (c) documents and materials evidencing dates of invention, including dates of conception and reduction to practice, (d) prosecution history files for all issued, pending or abandoned Assigned Patents, (e) a current electronic copy of a docketing report for the Assigned Patents accurately setting forth to the best of AMD's knowledge any and all dates relevant to the prosecution or maintenance of the Assigned Patents, including information relating to deadlines, payments and filings for the Assigned Patents, and the names, business addresses, email addresses, and phone numbers of all prosecution counsel and agents, and (f) any other material, non-privileged files and documents related to the Assigned Patents not otherwise provided under Section 3.2 in the possession of AMD. AMD shall, within sixty (60) days following the Effective Date, use reasonable efforts to transfer any material, privileged documents in the possession of AMD that directly and exclusively relate to an Assigned Patent. However, AMD shall not be obliged to transfer any privileged documents that relate to AMD's valuation or evaluation of the Assigned Patents (individually or collectively) or AMD's monetization options or plans for the Assigned Patents, such as privileged documents relating to the execution of this Agreement, the negotiations that

preceded this Agreement, and the activities pursuant to the statement of work previously executed by the parties. Notwithstanding anything else herein to the contrary, AMD shall only be obliged to transfer the files and documents that are: (i) actually in the possession of AMD, (ii) able to be located by AMD using reasonable diligence, and (iii) associated with the file of an Assigned Patent in the ordinary course of business.

3.3    Cooperation On and After Effective Date.

(a)    On the Effective Date, AMD shall, if instructed by Lone Star, notify or cause to be notified, Lone Star in writing separate from any disclosures made hereunder, of any relevant due dates related to prosecution, filing, defense, enforcement or maintenance of the Assigned Patents that will occur within sixty (60) days after the Effective Date. AMD or its Affiliates shall pay, or cause to be paid, any maintenance fees, annuities and the like relating to the Assigned Patents for which the fee is due within sixty (60) days of the Effective Date; provided that Lone Star shall reimburse AMD for any such fees paid and AMD's and its Affiliates' reasonable out of pocket costs related to such activities. AMD further covenants and agrees that after the Effective Date, it shall, upon reasonable request and without further consideration, execute and deliver to Lone Star any other documents and materials, and take any reasonable further actions (including taking reasonable action to obtain the cooperation of the named inventors), that are reasonably necessary for Lone Star to perfect its title in the Assigned Patents.

(b)    In addition, upon reasonable written request of Lone Star and with Lone Star reimbursing AMD's reasonable out-of-pocket cost and expense: (i) AMD shall take, or cause to be taken, reasonable actions to provide reasonable access to inventors and employees of AMD and relevant documents to assist Lone Star in the prosecution and maintenance of the Assigned Patents.

(c)    The Parties shall cooperate in good faith in attempting to identify additional third-parties that the Parties may agree, at each's sole discretion, to add to the Exhibit E list of Unlicensed Third Party Entities.

3.4    Patent Non-Renewal. Should Lone Star decide not to pay the renewal, annuity, or maintenance fee on any Assigned Patent (an **"Abandoned Patent"**), Lone Star shall notify AMD of its decision, by written notice, no later than ninety (90) days prior to the time that any such renewal, annuity, or maintenance fee is due. In addition, Lone Star shall assign the Abandoned Patent to AMD or to a Person selected by AMD in AMD's sole discretion if requested by AMD before the due date of such renewal, annuity, or maintenance fee, and Lone Star shall, upon reasonable request, assist AMD and/or a transferee in making a payment to maintain the patent in force (which may include making the payment subject to timely reimbursement by the requestor).

## 4.    LICENSE

4.1    License.

(a)    Lone Star on behalf of itself and its present and future Affiliates and any successor or assign (collectively **"Grantor"**) hereby grants to AMD and its present and future Affiliates and its and their successors and assigns (each as a **"Grantee"**), effective as of the Effective Date, a fully paid up, irrevocable, worldwide, transferable, non-exclusive, license under the Assigned Patents to use, develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of a Grantee's Licensed Products. However, the license shall not extend to any future Affiliate of Grantee that was deemed an Unlicensed Third Party Entity prior to becoming so affiliated with Grantee.

(b)    The license grant in Section 4.1(a) shall:

(i)    continue to be retained by any Affiliate of AMD as of the Effective Date (and their successors and assigns) even if such Affiliate of AMD (and its successors and assigns), subsequent to the Effective Date, is no longer an Affiliate of AMD (including following any further changes in the Person Controlling such Affiliate) ("**Former Affiliate**"); and

(ii)    continue to apply to sales of an asset of AMD and AMD's Affiliates (and its and their successors and assigns) by an acquiring third party of such asset in the event that all rights, title and interest in such asset is sold, transferred or otherwise disposed of by AMD or AMD's Affiliate (and its and their successors and assigns), as applicable (including, without limitation, the sale of a business unit or division of AMD or AMD's Affiliates or a sale of the technology associated with a Licensed Product) ("**Former Asset**"); provided, however, that the license grant in Section 4.1(a) shall apply only for as long as such Former Asset is maintained by such acquiring third party in a manner capable of being independently audited. Notwithstanding the foregoing, the license grant in Section 4.1(a) shall not apply to any assets, software, technology, products or services of the third party (or Affiliates of such third party) that Controls such Former Asset.

(c)    Nothing in Section 4.1(b) shall in any way limit, diminish or otherwise impact the license granted under Section 4.1(a) to AMD's present or future Affiliates that remain Affiliates of AMD after the transactions contemplated in Section 4.1(b).

(d)    For clarity, the license granted in Section 4 shall extend to the joint venture between AMD and Nantong Fujitsu Microelectronics Co., Ltd. that was formed with the assets of AMD Technologies (China) Co. Ltd. and Advanced Micro Devices Export Sdn. Bhd The agreements forming this joint venture were publically announced by AMD on October 15, 2015.

4.2    Combinations. Without limiting the rights granted hereunder, the licenses granted in Section 4.1 extend to the supply by each Grantee of a Licensed Product that is combined with or intended to be combined with products and services of third parties (and any subsequent sale, offer to sell, importation, exportation, distribution, use, and/or other exploitation of the Licensed Product by those third parties) but only to the extent that:

(a)    in the absence of such a license, AMD or any of its Affiliates would be obligated to indemnify such third parties for the use of a Licensed Product that is combined with or intended to be combined with the products or services of such third parties; or

(b)    in the absence of such a license, the Grantee's Licensed Product (alone or when combined with the products or services of a third party) would directly or indirectly infringe any of the Assigned Patents.

4.3    Sub-license rights. During the period from the Effective Date until six years following the date of expiration of the last to expire of the Assigned Patents, in the event that Grantor is in breach of section 6.2(f), Grantor hereby grants to Grantee and its present and future Affiliates and its and their successors and assigns, effective as of the Effective Date, a fully paid up, irrevocable, worldwide, transferable, non-exclusive, sublicensable right, sublicensable only to the one or more Persons that are (i) not Unlicensed Third Party Entities, and (ii) which were subjected to an assertion or legal action which resulted in said breach (the "Selected Third Party Entities"), under the Assigned Patents to use, develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of the past, present and future products and/or services of the one or more Selected Third Party Entities.

4.4    Covenant Not To Sue. During the period from the Effective Date until six years following the date of expiration of the last to expire of the Assigned Patents, Grantors hereby covenant not to sue, assert, or seek damages, injunctive relief or other remedies for any claims, and covenant to forbid any third party assignee, transferee or delegate of any right, title and/or interest of any intellectual property claim of Grantors from pursuing any of the same, from Grantees, suppliers, distributors and resellers of Grantees, and direct and indirect customers of Grantees, for infringement (whether direct, contributory, by inducement or otherwise) of the Assigned Patents based on the manufacture, sale, offer for sale, lease, importation, export, distribution, display, demonstration, copying, modification, transfer, or use or exploitation of materials, devices, software or firmware, services and products that are used, made or supplied directly or indirectly by or for Grantees. The foregoing covenant shall not constitute a general license, release or covenant to any customer of Grantees and shall apply to a customer only with respect to those materials, software or firmware, services, products and devices originating from or designed by or for Grantees.

4.5    Reservation of Rights. All rights not expressly granted in this Agreement are reserved. No additional rights whatsoever (including any implied licenses) are granted by implication, exhaustion, estoppel or otherwise.

## 5.    PAYMENT TERMS

5.1    Contingent Payments. For any Proceeds received on a given date AMD shall receive:

(a)    Thirty-five percent (35%) of such Proceeds if aggregate Proceeds received from all monetization efforts related to the Assigned Patents are less than fifty million U.S. dollars (US$50,000,000.00); and

(b)    Fifty percent (50%) of such Proceeds if aggregate Proceeds received from all monetization efforts related to the Assigned patents are equal to or in excess of fifty million U.S. dollars (US$50,000,000.00) (collectively the "Back-end Proceeds").

Lone Star shall require in its retainer agreement with Law Firm, and in all agreements with third-parties pursued under the Assigned Patents, that all Proceeds be received in the first instance by Law Firm. The retainer agreement shall further require that Law Firm shall be responsible to distribute the amount payable to AMD under 5.1(a) – (b), if any, to AMD within forty-five (45) days of actual receipt of Proceeds, with payment made by wire transfer to AMD's bank account provided by AMD in accordance with Section 5.2.

5.2    Amounts Payable by Lone Star to AMD. Back-end Proceeds payable by Lone Star (via Law Firm) to AMD under this Agreement shall be paid in United States dollars without accounting for any withholding, deduction or any other payment of any taxes, duties, levies, fees (contingent or otherwise), excises or tariffs imposed on any of Lone Star's activities in connection with the Assigned Patents. Any payments to AMD shall be made by wire transfer to:



ACCOUNT NAME BENEFICIARY: ADVANCED MICRO DEVICES, INC.

5.3    If the Parties cannot agree on the express dollar value at the time of settlement of any non-cash component included in the Proceeds, the Parties agree to retain the services of a mutually agreeable

accounting or appraisal individual or firm, which will assign a value determined by such person or firm to such item, thing, or agreement for purposes of determining the present cash value of the Proceeds.

5.4     To ensure compliance with the payment terms under this Section 5, Lone Star hereby pledges and grants to the AMD a lien on, and security interest in, and to all of its right, title and interest in, to and under all the Assigned Patents and execute the Security Interest Agreement of Exhibit G attached hereto. Lone Star agrees to provide any documents, information and assistance necessary to enable AMD to register its security interest against the title of the Assigned Patents in the patent office relevant to Assigned Patents.

        (a)     In the event of the sale, transfer or other disposition of one or more of the Assigned Patents, Lone Star shall request in writing the release of AMD's lien on, and security interest in, and to all of its right, title and interest of the one or more Assigned Patents. Within sixty (60) days of receipt of such written notice from Lone Star requesting the release, then AMD shall be obligated to provide such release of the lien on, and security interest in, and to all of its right, title and interest of the one or more Assigned Patents provided that Lone Star and Law Firm have provided timely access (and no later than fifteen (15) days after transmission of its written request) to all necessary financial records related to the Proceeds sufficient for AMD to reasonably determine that all Back-end Proceeds payable to AMD hereunder have been paid to AMD. AMD shall not be obligated to provide any release under this Section 5.4 if Back-end Proceeds are owed to AMD or if AMD disputes with Lone Star the amounts of Back-end Proceeds payable to AMD.

## 6.     REPRESENTATIONS AND WARRANTIES

6.1     Except as set forth in the applicable section of the attached schedules setting forth specific exceptions to AMD's representations and warranties below (the "Disclosure Schedule"), and in any other section of the Disclosure Schedule to the extent the relevance thereto is reasonably apparent from such disclosure, AMD represents and warrants to Lone Star as of the Effective Date (except for such representations and warranties made only as of a specific date) that each of the statements in this Section 6.1 is true and correct. For purposes of this Section 6.1, "Knowledge" means the actual knowledge of any of its officers and the members of its IP Law Group formed after a reasonable investigation of AMD's records as kept in the ordinary course of business.

        (a)     Authority; Enforceability.

                (i)     AMD is validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as the case may be. AMD has the right and authority to enter into this Agreement and to carry out its obligations hereunder and requires no third party consent, approval, and/or other authorization to enter into this Agreement and to carry out its obligations hereunder, including the assignment of the Listed Patents to Lone Star. This Agreement has been duly authorized, executed and delivered by AMD and constitutes a valid and binding agreement of AMD, enforceable against AMD in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

                (ii)     The execution and delivery of this Agreement and the performance by AMD of its obligations hereunder do not and will not violate any provision of the organizational documents of AMD and will not result in a breach of the terms, conditions or provisions of, or constitute a default under any contract, instrument, order, judgment or decree to which AMD is subject.

(b)     Title and Contest.

(i)     To AMD's Knowledge, AMD or one of its Affiliates has been assigned good and marketable title to each Listed Patent it is assigning hereunder, including all rights, title, and interest in each such Listed Patent and the right to sue for past, present and future infringement thereof.

(ii)     To AMD's Knowledge, AMD or one of its Affiliates is the original assignee of the Listed Patents. To AMD's Knowledge, AMD has obtained previously executed assignments for each Listed Patent it is assigning hereunder, and either already has or will properly record or cooperate to have the same recorded with the USPTO or any other appropriate US or foreign country as necessary to perfect AMD's rights and title therein in accordance with or as permitted by the governing law and regulations in each respective jurisdiction.

(iii)     Except as set forth in Section 6.1(b)(iii) of the Disclosure Schedule, to AMD's Knowledge, neither AMD nor its Affiliates has created or permitted the creation of any liens, mortgages, security interests, or other encumbrances on title, or restrictions on transfer on the Listed Patents, in each case, which exist as of the Effective Date. AMD is not party to any existing contracts, agreements, options, commitments, or rights with, to, or in any person to acquire any of the Listed Patents.

(iv)     To AMD's knowledge, none of the Listed Patents have been found invalid or unenforceable for any reason in any administrative, arbitration, or judicial proceeding. To AMD's Knowledge, there is no litigation, opposition, cancellation, proceeding, objection or claim pending, asserted or threatened against AMD concerning the Listed Patents.

(v)     Except as set forth in Section 6.1(b)(v) of the Disclosure Schedule, to AMD's Knowledge, neither AMD nor its Affiliates has initiated any enforcement action with respect to any of the Listed Patents.

(vi)     Except as set forth in Section 6.1(b)(vi) of the Disclosure Schedule, to AMD's Knowledge none of the Listed Patents is subject to any exclusive grant or right.

(vii)     To AMD's knowledge, none of the Unlicensed Third Party Entities have been granted any rights (other than potentially through agreements referenced in Exhibit E, an implied license or through AMD's or its Affiliates' standardization activities (or activities related to specifications that are intended to be widely adopted and/or promulgated) (collectively "Standards"), and other pre-existing specification-related or Standards-related licenses, covenants and promises of AMD or any of its Affiliates) by AMD or its Affiliates to the Assigned Patents to use, develop, copy, modify, import, make and have made, offer for sale, sell, lease, import, export, distribute, demonstrate, display, transfer and/or otherwise exploit or dispose of a product or service by the Unlicensed Third Party.

(c)     Litigation.  Except as set forth in Section 6.1(c) of the Disclosure Schedule, AMD is not presently subject to any injunction, order or other decree of any Governmental Authority related to the Listed Patents or the transactions contemplated hereby.

6.2     Lone Star.  Lone Star hereby represents and warrants to AMD that:

(a)     Lone Star has been duly organized, and is validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as the case may be.

(b)     Lone Star has the right and authority to enter into this Agreement and to carry out its obligations hereunder and requires no third party consent, approval, and/or other authorization to enter

into this Agreement and to carry out its obligations hereunder. This Agreement has been duly authorized, executed and delivered by Lone Star and constitutes a valid and binding agreement of such party, enforceable against such party in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)     The execution and delivery of this Agreement and the performance by Lone Star of its obligations hereunder do not and will not conflict with, or violate any provision of, the organizational documents of Lone Star and will not conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under any contract, instrument, order, judgment or decree to which Lone Star is subject.

(d)     Lone Star has conducted an independent review of the Listed Patents and its advisors have had the opportunity to request access to any materials (including, but not limited to any, to requesting materials on any Existing Encumbrances and any other relevant materials) related to the Listed Patents and have had an opportunity to request an opportunity to meet (in person or electronically) with appropriate AMD personnel to discuss the Listed Patents, any Existing Encumbrances and any other relevant materials.

(e)     Lone Star will maintain all patents in force, unless Lone Star provides the notification to AMD required by Section 3.4, Lone Star will not purport to transfer any Assigned Patent unless such transfer is made in compliance with Section 2.6.

(f)     Lone Star acknowledges that the Assigned Patents are subject to Existing Encumbrances to other Persons and that Lone Star represents and warrants that it shall not commence, direct or control any legal action seeking to enforce and/or licensing activity asserting any of the Assigned Patents against a Person that is (1) not an Unlicensed Third Party Entity or Affiliate thereof, or (2) is a distributor, reseller, or direct or indirect customer with respect to materials, devices, software or firmware, services or products that are used, made or supplied directly or indirectly by or for a Person that is not an Unlicensed Third Party Entity.

6.3     Provisions for Breach.

(a)     Breach by AMD. The Parties agree that if there is a breach of a representation and warranty as to a particular Assigned Patent (the **"Breaching Patent"**) by AMD then the exclusive remedy for such breach shall be that AMD will transfer –one or more Replacement Patents (defined below) to Lone Star. The **"Replacement Patents"** shall include a Selected Patent (defined below) and, to the extent owned by AMD, any divisionals, provisionals, re-exams, continuations, continuations-in-part, extensions or reissues of the Selected Patent, any applications for the foregoing in all countries of the world, and any other procedure or formality with respect to the aforesaid that can result in an enforceable patent right anywhere in the world. The **"Selected Patent"** shall be a U.S. patent selected by AMD in its sole discretion for which all of the following is true: (1) the Selected Patent is wholly owned by AMD, (2) the Selected Patent has not been claim charted by AMD, as evidenced by AMD's written records, (3) the Selected Patent has not been asserted by AMD against any entity, as evidenced by AMD's written records, and (4) the Replacement Patent was selected by AMD from one or more lists of patents provided to AMD by Lone Star.

(b)     Breach by Lone Star. The parties agree that if there is a breach of a representation and warranty by Lone Star of:

(i)       Section 6.2(f), then the sublicense rights described in Section 4.3 hereby immediately vest in AMD with respect to the patents asserted in violation of Section 6.2(f).

(ii)      Section 5, then AMD shall be entitled to recover its reasonable attorney's fees incurred to enforce its right to the Back-end Proceeds.

## 7.    MISCELLANEOUS

7.1    Applicable Law.    The validity, construction, and performance of this Agreement shall be governed by and construed first in accordance with the federal laws of the United States to the extent federal subject matter jurisdiction exists, and second in accordance with the laws of the State of California, exclusive of its choice of law rules. With respect to all civil actions or other legal or equitable proceedings directly arising between the parties or any of their affiliates under this Agreement, the parties consent to exclusive jurisdiction and venue in the United States District Court for the Northern District of California located in Santa Clara County (the "Forum") unless no federal jurisdiction exists, in which case the parties consent to exclusive jurisdiction and venue in a state court of California located in Santa Clara County (the "Alternate Forum"). Each party irrevocably consents to personal jurisdiction and waives the defense of forum non conveniens in the Forum, or Alternate Forum, if applicable, with respect to itself and its Affiliates. Process may be served on either party in the manner authorized by applicable law or court rule.

7.2    LIMITATION ON CONSEQUENTIAL DAMAGES. EXCEPT IN THE CASE OF FRAUD OR BREACH OF SECTION 7.6 (CONFIDENTIALITY), NO PARTY SHALL BE LIABLE TO ANY OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE LIMITATIONS ON POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

7.3    LIMITATION OF LIABILITY.    EXCEPT IN THE CASE OF FRAUD OR BREACH OF SECTION 4 (LICENSE), SECTION 5 (PAYMENT TERMS), SECTION 6 (WARRANTIES), OR SECTION 7.6 (CONFIDENTIALITY), WITHOUT WAIVING ANY OTHER RIGHTS OF THE PARTIES, INCLUDING ANY RIGHT TO SEEK SPECIFIC PERFORMANCE OR SEEK OTHER EQUITABLE RELIEF, NO PARTY'S TOTAL LIABILITY (EXCLUDING PAYMENT OBLIGATIONS) UNDER THIS AGREEMENT SHALL EXCEED TEN THOUSAND US DOLLARS ($10,000.00). FURTHER, WITH RESPECT TO ANY BREACH BY AMD OF SECTION 6.1(b)(i) OR 6.1(b)(ii) DISCOVERED MORE THAN TWO YEARS AFTER THE EFFECTIVE DATE, AMD SHALL BE OBLIGED TO USE BEST EFFORTS TO CURE THE BREACH, BUT AMD'S TOTAL LIABILITY SHALL NOT EXCEED TEN THOUSAND US DOLLARS ($10,000.00). THE PARTIES ACKNOWLEDGE THAT THESE LIMITATIONS ON POTENTIAL LIABILITIES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

7.4    DISCLAIMER OF REPRESENTATIONS AND WARRANTIES. NO PARTY MAKES ANY REPRESENTATION OR WARRANTY EXCEPT FOR THEIR RESPECTIVE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 6, AND EACH PARTY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6 HEREOF, NEITHER PARTY GIVES THE OTHER PARTY ANY ASSURANCE (A) REGARDING THE PATENTABILITY OF ANY CLAIMED INVENTION IN, OR THE VALIDITY, PATENTABILITY, SCOPE, COVERAGE OR ENFORCEABILITY OF ANY PATENT OR (B) THAT MANUFACTURE, USE, SALE, OFFERING FOR SALE, IMPORTATION, EXPORTATION OR

OTHER DISTRIBUTION OF ANY PRODUCT OR METHOD DISCLOSED AND CLAIMED IN ANY PATENT SHALL NOT CONSTITUTE AN INFRINGEMENT OF THE INTELLECTUAL PROPERTY RIGHTS OF OTHER PERSONS. EXCEPT AS SPECIFICALLY PROVIDED IN SECTION 6 HEREOF, THE ASSIGNED PATENTS ARE ASSIGNED ON AN "AS IS" BASIS WITHOUT ANY FURTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY.

7.5     Compliance with Laws. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

7.6     Confidentiality of Terms. All terms and conditions in this Agreement and all communications and transactions between the parties and their respective Affiliates related thereto, including without limitation, those made in connection with this Agreement under Section 3.3, shall be kept in confidence by the parties and their respective Affiliates. The parties shall not now or hereafter divulge this Agreement or any of its terms to any third party except: (a) with the prior written consent of the other party; (b) to any Governmental Authority having jurisdiction to require disclosure, or to any arbitral body, to the extent legally compelled by same; (c) as otherwise may be required by law or legal process, including to legal and financial advisors that are bound by a written obligation to maintain such information confidential that is at least as protective as the terms of this Section, in their capacity of advising a party in such matters; (d) during the course of litigation, so long as the disclosure of such terms and conditions are restricted in the same manner as is the highly confidential information of other litigating parties; (e) to the extent reasonably necessary, to accountants, banks, and financing sources, current and future providers of capital, investors, potential acquirors and current and future financing sources and their advisors that are bound by a written or professional obligation to maintain such information confidential that is at least as protective as the terms of this Section, solely in connection with or compliance with an acquisition or financing transactions and any applicable reporting obligations; or (f) while obtaining legal advice from legal counsel as needed in the normal course of business; provided that, in (b) through (e) above, the parties shall use all legitimate and legal means available to minimize the disclosure to third parties, including seeking a confidential treatment request or protective order whenever available. The Confidentiality and Common Interest Agreement shall govern the treatment of all other confidential and/or privileged information provided pursuant to this Agreement.

7.7     Sensitive Information. The parties agree that this Agreement may contain competitively sensitive information, the public disclosure of which would be competitively harmful. The parties agree that each party shall notify the other parties prior to filing the Agreement as an exhibit to any registration statement or periodic report filed with the United States Securities and Exchange Commission or any counterpart under any foreign jurisdiction (a "Securities Regulator") and cooperate with the non-filing party, in jointly identifying provisions which the filing party would redact and/or request that they receive confidential treatment in connection with any such filing. The redaction and/or request for confidential treatment shall be made in a manner consistent with applicable Securities Regulator's regulations and guidance. The request shall seek the longest confidentiality term possible. Any confidentiality request shall be submitted to and subject to the non-filing parties' reasonable approval in advance of filing.

7.8     Publicity. No party shall issue any press release or make other public statements with respect to the transactions contemplated by this Agreement or identifying the other party by name without the prior written consent of the other party, except as otherwise permitted by Sections 7.6 or 7.7 or except with respect to disclosures that are consistent with prior disclosures made in compliance with this Section 7.8.

7.9     Termination. The following sections shall survive any termination of this Agreement: Sections 1, 2.3, 4, 5, 6, and 7.

7.10    Entire Agreement; Headings. This Agreement reflects the complete understanding of the parties regarding the subject of the Agreement, and supersedes all prior related negotiations. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

7.11    Notices. Any notice under this Agreement shall be effective upon receipt when made in writing and delivered to the other party at the address stated below. Notice by email or facsimile is effective upon receipt if an original signature copy is mailed contemporaneously to the other party at the address stated below:

For AMD:
Advanced Micro Devices, Inc.
7171 Southwest Pkwy, M/S B100.T
Austin, TX 78735 USA
Attn: General Counsel
Facsimile: 1-512-602-1252
E-mail: kevin.oneil@amd.com


For Lone Star:
Lone Star Silicon Innovations LLC
5204 Bluewater Drive, Frisco, TX 75034
Attn: Khaled Fekih-Romdhane, Managing Partner
E-mail: khaled@longhornip.com


7.12    Relationship of Parties. The parties hereto are independent contractors. No party has any express or implied right or authority under this Agreement to assume or create any obligations on behalf of any other party or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or agency relationship between the parties hereto or any beneficiaries hereof.

7.13    Severability. To the extent any terms or conditions of this Agreement are held invalid or unenforceable in a jurisdiction, those terms or conditions shall be enforced to the maximum extent possible in that jurisdiction and the remaining terms and conditions shall retain full force and effect in that jurisdiction, so long as the remaining Agreement continues to express the intent of the parties.

7.14    Waiver. Failure by any party to enforce any term of this Agreement shall not be deemed a waiver of future enforcement of that or any other term in this Agreement.

7.15    Successors; Assignment. AMD and its Affiliates may assign their respective rights in this Agreement to their respective successors in interest. Lone Star may only assign this Agreement with a transfer of all of the Assigned Patents, as provided by Section 2.6.

7.16    Modifications. This Agreement may not be modified after the Effective Date except by a written amendment that expressly references this Agreement and that is signed by an authorized officer of each party.

7.17    Construction. As used in this Agreement, (a) the words "include" and "including" and variations

thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation," and (b) unless the context otherwise requires, the word "or" shall be deemed to be an inclusive "or" and shall have the meaning equivalent to "and/or."

7.18    Specific Performance. The parties agree that irreparable damage may occur in the event that any party fails to comply with this Agreement in accordance with its terms and that the parties shall be entitled to seek specific performance in such event, in addition to any other remedy at law or in equity. The parties agree that, in the event of any breach or threatened breach by another party of any covenant or obligation contained in this Agreement, the non-breaching party shall be entitled to seek (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (b) an injunction restraining such breach or threatened breach. The parties further agree that no party or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 7.18, and the parties irrevocably waive any rights they may have to require the obtaining, furnishing or posting of any such bond or similar instrument. The remedies available to the parties pursuant to this Section 7.18 shall be in addition to any other remedy to which such parties are entitled at law or in equity, and the election to pursue an injunction or specific performance shall not restrict, impair or otherwise limit such parties from recovery of monetary damages.

7.19    Signatures. This Agreement may be executed in counterparts, each of which shall be deemed an original, but each together shall constitute one and the same instrument. For purposes hereof, an email or facsimile copy of this Agreement, including the executed signature pages hereto, shall be deemed to be an original. Notwithstanding the foregoing, the parties shall deliver original signature copies of this Agreement to each other party as soon as practicable following execution thereof.

IN WITNESS WHEREOF, the parties have executed this Patent Purchase Agreement as of the Effective Date:

Lone Star Silicon Innovations LLC

ADVANCED MICRO DEVICES, INC.

Signature:

Name: __Christian Dubuc__

Title: __Managing Partner__

Date: __August 4, 2016__

Signature: 

Name: __Kevin O'Neil__

Title: __VP-IP & Licensing__

Date: __August 4, 2016__

## Exhibit A

## LISTED PATENTS

| Family | Title | Patent No. |
|---|---|---|
| 1 | Semiconductor device having an elevated active region formed in an oxide trench | US6104069 |
| 1 | Semiconductor device having an elevated active region formed in an oxide trench and method of manufacture thereof | US5872038 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US5956610 |
| 2 | Local interconnects for improved alignment tolerance and size reduction | US6121663 |
| 2 | Methods and arrangements for insulating local interconnects for improved alignment tolerance and size reduction | US6399480 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US6303949 |
| 3 | Run to run control process for controlling critical dimensions | USRE39518 |
| 3 | Run-to-run control process for controlling critical dimensions | US5926690 |
| 4 | Method of forming a contact hole in an interlevel dielectric layer using dual etch stops | US5912188 |
| 5 | Elimination of residual materials in a multiple-layer interconnect structure | US6153933 |
| 6 | Method and system for providing an interconnect having reduced failure rates due to voids | US6010960 |
| 7 | Method of making gate dielectric for sub-half micron mos transistors including a graded dielectric constant | US6015739 |
| 8 | Silicided shallow junction transistor formation and structure with high and low breakdown voltages | US5973372 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6057239 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6424039 |
| 10 | Borderless vias | US5925932 |
| 10 | High integrity vias | US6097090 |
| 10 | Borderless vias | US6232221 |
| 11 | Core cell structure and corresponding process for nand-type high performance flash memory device | US6023085 |
| 11 | Core cell structure and corresponding process for nand type performance flash memory device | US6372577 |
| 12 | Methods and arrangements for improved spacer formation within a semiconductor device | US6103611 |
| 12 | Semiconductor device having uniform spacers | US6380588 |
| 13 | Semiconductor device having dual gate electrode material and process of fabrication thereof | US6043157 |
| 14 | Selectively sized spacers | US6046089 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6097061 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6667227 |
| 16 | Integrated circuit having an interlevel interconnect coupled to a source/drain region(s) with source/drain region(s) boundary overlap and reduced parasitic capacitance | US6146978 |

| Family | Title | Patent No. |
|--------|-------|------------|
| 17 | Ultrathin, nitrogen-containing mosfet sidewall spacers using low-temperature semiconductor fabrication process | US6323519 |
| 18 | Use of silicon oxynitride arc for metal layers | US6326231 |
| 19 | Semiconductor package with supported overhanging upper die | US6337226 |
| 20 | Low dielectric constant etch stop layers in integrated circuit interconnects | US6388330 |

Confidential

## Exhibit B

## ASSIGNED PATENTS

| Family | Title | Patent No. |
|--------|-------|------------|
| 1 | Semiconductor device having an elevated active region formed in an oxide trench | US6104069 |
| 1 | Semiconductor device having an elevated active region formed in an oxide trench and method of manufacture thereof | US5872038 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US5956610 |
| 2 | Local interconnects for improved alignment tolerance and size reduction | US6121663 |
| 2 | Methods and arrangements for insulating local interconnects for improved alignment tolerance and size reduction | US6399480 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US6303949 |
| 3 | Run to run control process for controlling critical dimensions | USRE39518 |
| 3 | Run-to-run control process for controlling critical dimensions | US5926690 |
| 4 | Method of forming a contact hole in an interlevel dielectric layer using dual etch stops | US5912188 |
| 5 | Elimination of residual materials in a multiple-layer interconnect structure | US6153933 |
| 6 | Method and system for providing an interconnect having reduced failure rates due to voids | US6010960 |
| 7 | Method of making gate dielectric for sub-half micron mos transistors including a graded dielectric constant | US6015739 |
| 8 | Silicided shallow junction transistor formation and structure with high and low breakdown voltages | US5973372 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6057239 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6424039 |
| 10 | Borderless vias | US5925932 |
| 10 | High integrity vias | US6097090 |
| 10 | Borderless vias | US6232221 |
| 11 | Core cell structure and corresponding process for nand-type high performance flash memory device | US6023085 |
| 11 | Core cell structure and corresponding process for nand type performance flash memory device | US6372577 |
| 12 | Methods and arrangements for improved spacer formation within a semiconductor device | US6103611 |
| 12 | Semiconductor device having uniform spacers | US6380588 |
| 13 | Semiconductor device having dual gate electrode material and process of fabrication thereof | US6043157 |
| 14 | Selectively sized spacers | US6046089 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6097061 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6667227 |
| 16 | Integrated circuit having an interlevel interconnect coupled to a source/drain region(s) with source/drain region(s) boundary overlap and reduced parasitic capacitance | US6146978 |

Confidential

| Family | Title | Patent No. |
|--------|-------|------------|
| 17 | Ultrathin, nitrogen-containing mosfet sidewall spacers using low-temperature semiconductor fabrication process | US6323519 |
| 18 | Use of silicon oxynitride arc for metal layers | US6326231 |
| 19 | Semiconductor package with supported overhanging upper die | US6337226 |
| 20 | Low dielectric constant etch stop layers in integrated circuit interconnects | US6388330 |

IN WITNESS WHEREOF, this Assignment of Patent Rights is executed at _MARKHAM_, _ON_
on _AUGUST  4 , 2016_

ASSIGNOR

By: _[signature]_

Name: _KEVIN O'NEIL_

Title: _VP - IP & LICENSING_

*(Signature must be notarized)*

_[signature] Linda Lei-Mun Lam_

Before me, ___LINDA LAM___

Notary Public at _PROVINCE OF ONTARIO_

Date: _August 4. 2016_

IN TESTIMONY WHEREOF, in accepting said Assignment, I hereunto set my hand as of the date indicated below:

**Lone Star Silicon Innovations LLC**

_AUG 4, 2016_
Date

_[signature]_
Signature

Name: _CHRISTIAN DUBUC_
Title: _MANAGING PARTNER_

*(Signature must be notarized)*

_[signature]_

Before me, _Michael Lee_

Notary Public at _Allen, TEXAS_

Date: _August 4, 2016_

**MICHAEL LEE**
Notary Public, State of Texas
My Commission Expires
July 22, 2018

Confidential

## Exhibit C

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, Advanced Micro Devices, Inc., a Delaware corporation, with a registered address at One AMD Place, Sunnyvale, CA 94088-3453 USA ("**Assignor**"), does hereby assign, transfer and convey unto Lone Star Silicon Innovations LLC, an entity organized under the laws of Texas having its primary place of business at 5204 Bluewater Drive, Frisco, TX 75034 ("**Assignee**"), all of Assignor's entire right, title and interest in and to all patents and patent applications listed in the attached Exhibit 1 (collectively "**Patent Rights**"), subject to the terms and conditions of the Confidential Purchase and Sale Agreement (the "**Agreement**"). Assignor and Assignee acknowledge that some of the Patent Rights may be currently expired or abandoned.

In addition, Assignor agrees to and hereby does sell, assign, transfer and convey unto Assignee all rights (i) in and to causes of action and enforcement rights for the Patent Rights including all rights to pursue damages, injunctive relief and other remedies for past, present and future infringement of the Patent Rights, (ii) the right to apply (or continue prosecution) in any and all countries of the world for patents, design patents, utility models, certificates of invention or other governmental grants for the Patent Rights, including under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement or understanding, and (iii) the rights, if any, to revive prosecution of any abandoned Patent Rights.

Assignor also hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents or certificates of invention or equivalent which may be granted upon any of the Patent Rights in the name of Assignee, as the assignee to the entire interest therein.

The terms and conditions of this Assignment shall inure to the benefit of Assignee, its successor and other legal representatives, and shall be binding upon Assignor, its successor, assigns and other legal representatives.

Confidential

## Exhibit 1

| Family | Title | Patent No. |
|---|---|---|
| 1 | Semiconductor device having an elevated active region formed in an oxide trench | US6104069 |
| 1 | Semiconductor device having an elevated active region formed in an oxide trench and method of manufacture thereof | US5872038 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US5956610 |
| 2 | Local interconnects for improved alignment tolerance and size reduction | US6121663 |
| 2 | Methods and arrangements for insulating local interconnects for improved alignment tolerance and size reduction | US6399480 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US6303949 |
| 3 | Run to run control process for controlling critical dimensions | USRE39518 |
| 3 | Run-to-run control process for controlling critical dimensions | US5926690 |
| 4 | Method of forming a contact hole in an interlevel dielectric layer using dual etch stops | US5912188 |
| 5 | Elimination of residual materials in a multiple-layer interconnect structure | US6153933 |
| 6 | Method and system for providing an interconnect having reduced failure rates due to voids | US6010960 |
| 7 | Method of making gate dielectric for sub-half micron mos transistors including a graded dielectric constant | US6015739 |
| 8 | Silicided shallow junction transistor formation and structure with high and low breakdown voltages | US5973372 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6057239 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6424039 |
| 10 | Borderless vias | US5925932 |
| 10 | High integrity vias | US6097090 |
| 10 | Borderless vias | US6232221 |
| 11 | Core cell structure and corresponding process for nand-type high performance flash memory device | US6023085 |
| 11 | Core cell structure and corresponding process for nand type performance flash memory device | US6372577 |
| 12 | Methods and arrangements for improved spacer formation within a semiconductor device | US6103611 |
| 12 | Semiconductor device having uniform spacers | US6380588 |
| 13 | Semiconductor device having dual gate electrode material and process of fabrication thereof | US6043157 |
| 14 | Selectively sized spacers | US6046089 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6097061 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6667227 |
| 16 | Integrated circuit having an interlevel interconnect coupled to a source/drain region(s) with source/drain region(s) boundary overlap and reduced parasitic capacitance | US6146978 |

Confidential

| Family | Title | Patent No. |
|--------|-------|------------|
| 17 | Ultrathin, nitrogen-containing mosfet sidewall spacers using low-temperature semiconductor fabrication process | US6323519 |
| 18 | Use of silicon oxynitride arc for metal layers | US6326231 |
| 19 | Semiconductor package with supported overhanging upper die | US6337226 |
| 20 | Low dielectric constant etch stop layers in integrated circuit interconnects | US6388330 |

Confidential

## Exhibit D

## CONFIDENTIALITY AND COMMON INTEREST AGREEMENT

THIS CONFIDENTIALITY AND COMMON INTEREST AGREEMENT ("Agreement") is entered into between the undersigned parties.

### 1. Background.

1.1 Lone Star Silicon Innovations LLC, an entity organized under the laws of Texas having its primary place of business at 5204 Bluewater Drive, Frisco, TX 75034 ("Purchaser") and Advanced Micro Devices, Inc., a Delaware company ("Seller") (Purchaser and Seller are sometimes hereafter referred to herein as a "party" or the "parties"), have entered into a Patent Transfer Agreement ("PPA") under which Purchaser will acquire all substantial rights of Seller in certain patents and patent applications filed or to be filed throughout the world (the "Patent Matters").

1.2 The parties have agreed to exchange privileged and/or confidential information related to the Patent Matters and enforcement thereof. Confidential information includes all non-public information exchanged between the parties that relates to the Patent Matters and that is (a) marked "confidential" or with a similar legend; (b) disclosed in any other manner and identified as confidential at the time of disclosure; (c) accessed through any web based or electronic portal; and/or (d) learned as a result of a visit to a party's facilities.

1.3 The parties have a common interest in the Patent Matters and have agreed to treat their communications and those of their counsel relating to the Patent Matters as protected by the common interest privilege. Furtherance of the Patent Matters requires the exchange of proprietary documents and information, the joint development of legal strategies and the exchange of attorney work product developed by the parties and their respective counsel.

### 2. Common Interest.

2.1 The parties have a common, joint and mutual legal interest in cooperating with each other, to the extent permitted by law, to share information protected by the attorney-client privilege and by the work product doctrine with respect to the Patent Matters. Any counsel or consultant retained by a party or their counsel to assist in the Patent Matters shall be bound by, and entitled to the benefits of, this Agreement.

2.2 In order to further their common interest, the parties (and their counsel, on behalf of each party) may exchange confidential information and/or privileged and work product information, orally and in writing, including, without limitation, factual analyses, mental impressions, legal memoranda, source materials, draft legal documents, prosecution history files and other information (hereinafter "Protected Materials"). It is the mutual understanding of the Parties that the exchange of privileged or otherwise protected Protected Materials is not intended to enhance, diminish, or waive in any way the privileged or otherwise protected status of that information. The Parties also intend and understand that any exchange or discussion among themselves regarding such privileged Protected Materials will not constitute a waiver of any applicable privilege, immunity, or other protection.

2.3 The sole purpose for the exchange of the Protected Materials is to support the parties' common interest with respect to the prosecution and enforcement of the Patent Matters, and the parties may only use Protected Materials to further this purpose. Any Protected Materials exchanged shall continue to be protected under all applicable privileges and no such exchange shall constitute a waiver of any applicable privilege or protection.

### 3. Confidentiality & Nondisclosure.

3.1 The parties and their Counsel shall use the Protected Materials solely in connection with the Patent Matters and shall take appropriate steps to protect the privileged and confidential nature of the Protected Materials.

3.2 A party receiving Protected Materials ("Recipient") from the other party ("Discloser") shall protect such Protected Materials by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Protected Materials as Recipient uses to protect its own information of a like nature. Recipient shall not disclose any Protected Materials disclosed hereunder to any third party, and Recipient shall limit disclosure of Protected Materials to only those of its employees and contractors with a need to know and who are bound by confidentiality obligations with Recipient at least as restrictive as those contained in this Agreement. Each party shall be responsible for its employees', contractors', and counsel's adherence to the terms of this Agreement. Further, Recipient shall not reverse engineer, disassemble, or decompile any products, prototypes, software, or other tangible objects that embody Protected Materials.

3.3 Recipient shall not produce privileged Protected Materials unless or until directed to do so by an order of a court of competent jurisdiction, or upon the prior written consent of the other party. No privilege or objection shall be waived by a party hereunder without the prior written consent of the other party.

3.4 The parties agree that the inadvertent or unintentional disclosure of confidential, privileged or work product materials supplied under this Agreement, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of any applicable confidentiality, privilege or immunity, either as to the specific information disclosed or as to any other information relating thereto or on the same or related subject matter (and no party will assert such a waiver argument). Upon the discovery of the inadvertent error, the disclosing party shall promptly notify the other party, and both parties shall cooperate to restore the confidentiality, privilege or immunity to that disclosed material, including retrieval of all copies, if possible.

3.5 Except as herein provided, in the event that Recipient is requested or required in the context of a litigation, governmental, judicial or regulatory investigation or other similar proceedings (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar process) to disclose any Protected Materials, the party or their Counsel shall promptly inform the other party and their Counsel, assert all applicable privileges, including, without limitation, the common interest doctrine, the joint prosecution privilege, and take any other reasonable steps (at its own expense) to protect and preserve the confidentiality of and privileges relating to such Protected Materials .

### 4. Relationship; Additions; Termination.

4.1 This Agreement does not create any agency or similar relationship among the parties. Nothing in this Agreement requires a party to provide information or documents to the other party or to create Protected Materials to provide to the other party. Despite the execution of the PPA by Purchaser and Seller and the delivery of the files and documentation, as per Section 3.2 of the PPA, neither party nor their respective Counsel has the authority to waive any applicable privilege or doctrine on behalf of any other party.

4.2 Nothing in this Agreement affects the separate and independent representation of each party by its respective Counsel or creates an attorney client relationship between the Counsel for a party and the other party to this Agreement.

4.3 This Agreement shall continue until terminated upon the written request of either party. Upon termination, each party and their respective Counsel shall return any Protected Materials furnished by the other party. Notwithstanding termination, this Agreement shall continue to protect all Protected Materials disclosed prior to termination. Sections 3, 4 and 5 shall survive termination of this Agreement.

**5.     General Terms.**

5.1 This Agreement is governed by the laws of the State of California, without regard to its choice of law principles to the contrary. In the event any provision of this Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, the remaining terms shall remain in effect. Failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.

5.2 The parties agree that a breach of this Agreement would result in irreparable injury, that money damages would not be a sufficient remedy and that the disclosing party may be entitled to equitable relief, including injunctive relief, as a non-exclusive remedy for any such breach.

5.3 Notices given under this Agreement shall be given in writing and delivered by messenger or overnight delivery service to a party at the address specified in the PPA, and shall be deemed to have been given on the day received.

5.4 This Agreement memorializes a prior verbal discussion between the parties, and it is effective and binding upon each party at least as of the date it is signed by or on behalf of either party. This Agreement may be amended only by a writing signed by or on behalf of each party, and neither party may assign this Agreement without the prior written consent of the other party. This Agreement may be executed in counterparts. Any signature reproduced or transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be considered an original for purposes of this Agreement.

5.5 No Party makes any representation or warranty (express or implied) as to the legal or factual accuracy or completeness of any Protected Materials provided under this Agreement.

5.6 Each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Agreement is determined by a Court of competent jurisdiction to be invalid or unenforceable, the Parties intend for the Court to rewrite the invalid or unenforceable provision to preserve the intention of the Parties to the degree possible, and to keep the remainder of this Agreement in full force and effect.

5.7 This Agreement sets forth the entire agreement and understanding between the parties as to the protection of the Protected Materials and supersedes and merges all prior oral and written agreements, discussions and understandings between them regarding the subject matter of this Agreement. Notwithstanding the foregoing, this Agreement shall not supersede any existing nondisclosure or confidentiality agreement between the parties which contains terms more restrictive than those herein, and this Agreement in no way supersedes, amends or alters the requirements of the PPA.

5.8 This Agreement imposes no obligation upon Recipient with respect to Protected Materials that Recipient can reasonably demonstrate (a) was in Recipient's rightful possession on or before receipt from Discloser; (b) is or becomes a matter of public knowledge through no fault of Recipient; (c) is rightfully received by Recipient from a third party without a duty of confidentiality; or (d) is independently developed by Recipient without use of or reference to Protected Materials.

This Agreement is being executed by each of the undersigned counsel on behalf of the respective party he/she represents. By executing this agreement, the undersigned hereby acknowledge that they have read and understood the terms of this Agreement, that they have authority to bind their respective party, and that by their signing this Agreement, the Party agrees to be bound by all terms, conditions, and obligations contained herein.

**Lone Star Silicon Innovations LLC**

By: _____

Name: _____Christian Dubuc_____

Date: _____August 4, 2016_____

**Advanced Micro Devices, Inc.**

By: _____

Name: _____KEVIN ONEIL_____

Date: _____AUGUST 4, 2016_____

## Exhibit E

## Unlicensed Third Party Entities

Avago Technologies (including Broadcom Limited and LSI Corporation)

Elite Semiconductor Products Inc.

Etron Technology, Inc.

Integrated Silicon Solution Inc.

Kingston Technology Corporation

Marvell Technology Group, Limited

Maxim Integrated Products Inc.

MediaTek Inc.

Micron Technology, Inc.

Nanya Technology Corporation

Qualcomm Inc.***

Toshiba Corporation

SanDisk Corporation

Texas Instruments Incorporated

STMicroelectronics N.V.

Infineon Technologies AG**

United Microelectronics Corporation

Semiconductor Manufacturing International Corporation

Renesas Electronics Corporation

Tower Semiconductor Ltd.

Xilinx, Inc.

Zen-Tel Inc.


** Subject to certain licenses pursuant to AMD-Seimens AG agreement on or about Feb, 1985 and/or Joint Development Contract regarding GDDR5 Specification Development on or about Dec, 2005
*** Subject to certain licenses pursuant to an AMD-Qualcomm transaction related to AMD's former handheld business.

**Exhibit F**

## DISCLOSURE SCHEDULE

Reference is made to that certain Patent Transfer Agreement, dated as of August 4th, 2016 (the **"Agreement"**), by and between Lone Star Silicon Innovations LLC, an entity organized under the laws of [Enter Jurisdiction] having its primary place of business at [Enter Jurisdiction] (**"Lone Star"**), and Advanced Micro Devices, Inc., a Delaware corporation (**"AMD"**). Capitalized terms used but not defined in this disclosure schedule (the **"Disclosure Schedule"**) shall have the respective meanings ascribed to such terms in the Agreement.

Any matter disclosed in any section of this Disclosure Schedule shall be deemed to be disclosed with respect to (i) the corresponding section of the Agreement identified or cross-referenced therein, and (ii) any other section of the Agreement to which such disclosure's application or relevance is reasonably apparent on the face of such disclosure.

Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected herein. Such additional matters are set forth for informational purposes (but do not necessarily include other matters of a similar informational nature).

The disclosure of any specific item in this Disclosure Schedule shall not imply, establish or constitute an admission that such item or other items are or are not material, nor imply, establish or constitute an admission of such item's consequence or relevance to any determination of materiality. In any dispute or controversy between the parties, neither party shall use the fact of the disclosure of any such item as relevant to determine whether any obligation, item or matter not described in the Agreement or included herein is or is not material for purposes of the Agreement. Furthermore, the disclosure of any specific item in this Disclosure Schedule shall not imply, establish or constitute an admission that such item or other items are required to be disclosed under the Agreement.

Any item of information disclosed in this Disclosure Schedule shall be subject to the confidentiality terms and conditions set forth in Sections 7.6, 7.7 and 7.8 (and other terms and conditions if and to the extent relevant) of the Agreement.

Headings, other than numerical references to sections and subsections of the Agreement, are inserted in this Disclosure Schedule for convenience of reference only, and do not amend or change the express description of the section of this Disclosure Schedule referred to in the Agreement.

## Section 6.1(b): Title and Contest

Section 6.1(b)(iii):

None.

Section 6.1(b)(vi):

None.

Section 6.1(b)(vi):

None.

## Section 6.1(c): Litigation

None.

**Exhibit G**

### PATENT SECURITY AGREEMENT

**Patent Security Agreement,** dated as of August 4th, 2016, by Lone Star Silicon Innovations LLC, an entity organized under the laws of Texas having its primary place of business at 5204 Bluewater Drive, Frisco, TX 75034 (the "Grantor"), in favor of Advanced Micro Devices, Inc., an entity organized under the laws of Delaware having its primary place of business at 1 AMD Place, Sunnyvale, California, 94088 (the "Grantee").

### WITNESSETH:

WHEREAS, the Grantor is party to a Patent Assignment Agreement with an Effective Date of August 4th, 2016 (as amended or otherwise modified from time to time, the "Patent Transfer Agreement") pursuant to which the Grantee is selling its interest in certain patents to the Grantor and the Grantor is required to execute and deliver this Patent Security Agreement;

NOW, THEREFORE, in consideration of the promises and to induce the Grantee, to enter into the Patent Transfer, the Grantor hereby agrees with the Grantee as follows:

SECTION 1. Defined Terms. Unless otherwise defined herein, terms defined in the Patent Assignment Agreement and used herein have the meaning given to them in the Patent Agreement.

SECTION 2. Grant of Security Interest in Patents. The Grantor hereby pledges and grants to the Grantee a lien on, and security interest in, and to all of its right, title and interest in, to and under all the following pledged assets of the Grantor:

(a) the Assigned Patents of the Grantor listed on Schedule I attached hereto.

SECTION 3. The Security Agreement. The security interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interest granted to the Grantee pursuant to the Patent Transfer Agreement and the Grantor hereby acknowledges and affirms that the rights and remedies of the Grantee with respect to the security interest in the Assigned Patents made and granted hereby are more fully set forth in the Patent Transfer Agreement. In the event that any provision of this Patent Security Agreement is deemed to conflict with the Patent Transfer Agreement, the provisions of the Security Agreement shall control unless the Grantee shall otherwise determine.

SECTION 4. Termination. Upon the termination of the Patent Transfer Agreement, the Grantee shall, at the expense of the Grantor, execute, acknowledge, and deliver to the Grantor an instrument in writing in recordable form releasing the lien on and security interest in the Assigned Patents under this Patent Security Agreement and any other documents required to evidence the termination of the Grantee's interest in the Patents.

SECTION 5. Counterparts. This Patent Security Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Patent Security Agreement by signing and delivering one or more counterparts.

| Lone Star Silicon Innovations LLC | Advanced Micro Devices, Inc. |
|---|---|
| By: | By: |
| Name: Christian Dubuc | Name: KEVIN ONEIL |
| Date: August 4, 2016 | Date: AUGUST 4, 2016 |

## Exhibit I to Patent Security Agreement

| Family | Title | Patent No. |
|---|---|---|
| 1 | Semiconductor device having an elevated active region formed in an oxide trench | US6104069 |
| 1 | Semiconductor device having an elevated active region formed in an oxide trench and method of manufacture thereof | US5872038 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US5956610 |
| 2 | Local interconnects for improved alignment tolerance and size reduction | US6121663 |
| 2 | Methods and arrangements for insulating local interconnects for improved alignment tolerance and size reduction | US6399480 |
| 2 | Method and system for providing electrical insulation for local interconnect in a logic circuit | US6303949 |
| 3 | Run to run control process for controlling critical dimensions | USRE39518 |
| 3 | Run-to-run control process for controlling critical dimensions | US5926690 |
| 4 | Method of forming a contact hole in an interlevel dielectric layer using dual etch stops | US5912188 |
| 5 | Elimination of residual materials in a multiple-layer interconnect structure | US6153933 |
| 6 | Method and system for providing an interconnect having reduced failure rates due to voids | US6010960 |
| 7 | Method of making gate dielectric for sub-half micron mos transistors including a graded dielectric constant | US6015739 |
| 8 | Silicided shallow junction transistor formation and structure with high and low breakdown voltages | US5973372 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6057239 |
| 9 | Dual damascene process using sacrificial spin-on materials | US6424039 |
| 10 | Borderless vias | US5925932 |
| 10 | High integrity vias | US6097090 |
| 10 | Borderless vias | US6232221 |
| 11 | Core cell structure and corresponding process for nand-type high performance flash memory device | US6023085 |
| 11 | Core cell structure and corresponding process for nand type performance flash memory device | US6372577 |
| 12 | Methods and arrangements for improved spacer formation within a semiconductor device | US6103611 |
| 12 | Semiconductor device having uniform spacers | US6380588 |
| 13 | Semiconductor device having dual gate electrode material and process of fabrication thereof | US6043157 |
| 14 | Selectively sized spacers | US6046089 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6097061 |
| 15 | Trenched gate metal oxide semiconductor device and method | US6667227 |
| 16 | Integrated circuit having an interlevel interconnect coupled to a source/drain region(s) with source/drain region(s) boundary overlap and reduced parasitic capacitance | US6146978 |

| Family | Title | Patent No. |
|--------|-------|------------|
| 17 | Ultrathin, nitrogen-containing mosfet sidewall spacers using low-temperature semiconductor fabrication process | US6323519 |
| 18 | Use of silicon oxynitride arc for metal layers | US6326231 |
| 19 | Semiconductor package with supported overhanging upper die | US6337226 |
| 20 | Low dielectric constant etch stop layers in integrated circuit interconnects | US6388330 |

Confidential

## AMENDMENT to PATENT TRANSFER AGREEMENT

WHEREAS, the undersigned parties entered into a PATENT TRANSFER AGREEMENT, effective August 4, 2016 (the **"Agreement"**), by and among Lone Star Silicon Innovations LLC, an entity organized under the laws of State of Texas having its primary place of business at 8105 Rasor Blvd., Suite 210, Plano, Texas 75024 (**"Lone Star"**) and Advanced Micro Devices, Inc., a Delaware corporation (**"AMD"**). Lone Star and AMD are herein referred to separately as "a party" or collectively as "the parties."

WHEREAS, pursuant to the Agreement, Lone Star acquired certain patents (the **"Assigned Patents"**) from AMD, and Lone Star is currently engaged in efforts to enforce and license the Assigned Patents;

WHEREAS, pursuant to Paragraph 6.2(f) of the Agreement, Lone Star acknowledged that the Assigned Patents are subject to Existing Encumbrances to other Persons and represented and warranted that Lone Star will not commence, direct or control any legal action seeking to enforce and/or licensing activity asserting any of the Assigned Patents against a Person that is (1) not an Unlicensed Third Party Entity or Affiliate thereof, or (2) is a distributor, reseller, or direct or indirect customer with respect to materials, devices, software or firmware, services or products that are used, made or supplied directly or indirectly by or for a Person that is not an Unlicensed Third Party Entity;

WHEREAS, the Agreement limits Unlicensed Third Party Entity to only those Persons listed in Exhibit E thereof, their Affiliates, and all other Persons that the Parties may agree in writing in the future to add to Exhibit E, and the Parties further agreed in Paragraph 3.3(c) to cooperate in good faith in attempting to identify additional third-parties that they agree to add to the Exhibit E list of Unlicensed Third Party Entities; and

WHEREAS, the Parties now desire to supplement the Exhibit E list to include additional Unlicensed Third Party Entities;

NOW, THERFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereby agree to amend the Agreement as follows:

1.    The Exhibit E list of Unlicensed Third Party Entities is replaced and superseded in its entirety by the updated Exhibit E, dated November 18, 2016, attached to this AMENDMENT to PATENT TRANSFER AGREEMENT.

All other terms of the Agreement remain in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this AMENDMENT to PATENT TRANSFER AGREEMENT by their duly authorized officers in their respective corporate names.

Lone Star Silicon Innovations LLC          ADVANCED MICRO DEVICES, INC.

Signature: _Khaled Fekih Romdhane_   Signature: _____

Name: _KHALED FEKIH-ROMDHANE_   Name: _KEVIN ONEIL_

Title: _Managing Partner_   Title: _VP, IP & Licensing_

Date: _11-19-2016_   Date: _11-23-2016_

Confidential—Page 2–

**Exhibit E**

**(Amended November 18, 2016)**
**Unlicensed Third Party Entities**

Avago Technologies (including Broadcom Limited and LSI Corporation)

Elite Semiconductor Products Inc.

Etron Technology, Inc.

Integrated Silicon Solution Inc.

Kingston Technology Corporation

Marvell Technology Group, Limited

Maxim Integrated Products Inc.

MediaTek Inc.

Micron Technology, Inc.

Nanya Technology Corporation

Qualcomm Inc.***

Toshiba Corporation

SanDisk Corporation

Texas Instruments Incorporated

STMicroelectronics N.V.

Infineon Technologies AG**

United Microelectronics Corporation

Semiconductor Manufacturing International Corporation

Renesas Electronics Corporation

Tower Semiconductor Ltd.

Xilinx, Inc.

Zen-Tel Inc.

Western Digital Corporation

RPX Corporation****

** Subject to certain licenses pursuant to AMD-Seimens AG agreement on or about Feb, 1985 and/or Joint Development Contract regarding GDDR5 Specification Development on or about Dec, 2005

*** Subject to certain licenses pursuant to an AMD-Qualcomm transaction related to AMD's former handheld business.

**** Lone Star is permitted to grant RPX Corporation license rights that include the right for RPX to grant sublicenses to any and all RPX members.

# Exhibit 2

US006097061A

# United States Patent [19]

## Liu et al.

[11] **Patent Number:** **6,097,061**

[45] **Date of Patent:** **Aug. 1, 2000**

[54] **TRENCHED GATE METAL OXIDE SEMICONDUCTOR DEVICE AND METHOD**

[75] Inventors: **Yowjuang W. Liu**, San Jose; **Donald L. Wollesen**, Saratoga, both of Calif.

[73] Assignee: **Advanced Micro Devices, Inc.**, Sunnyvale, Calif.

[21] Appl. No.: **09/052,051**

[22] Filed: **Mar. 30, 1998**

[51] **Int. Cl.**[7] ............................ **H01L 29/76**; H01L 29/94; H01L 27/108

[52] **U.S. Cl.** ............................ **257/330**; 257/332; 257/333

[58] **Field of Search** ............................ 257/302, 330–334, 257/374, 388, 397, 510, 520, 622, 127, 153, 170, 171, 175, 244, 284, 332, 333

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,016,067 | 5/1991 | Mori | 357/23.4 |
| 5,378,655 | 1/1995 | Hutchings et al. | 437/203 |
| 5,705,415 | 1/1998 | Orlowski et al. | 437/43 |
| 5,770,878 | 6/1998 | Beasom | 257/330 |
| 5,773,343 | 6/1998 | Lee et al. | 438/259 |
| 5,883,399 | 3/1999 | Yin et al. | 257/66 |
| 5,953,602 | 9/1999 | Oh et al. | 438/201 |

*Primary Examiner*—Sheila V. Clark
*Attorney, Agent, or Firm*—Fenwick & West LLP

[57] **ABSTRACT**

A Metal Oxide Semiconductor (MOS) transistor and method for improving device scaling comprises a trenched polysilicon gate formed within a trench etched in a semiconductor substrate and further includes a source region, a drain region, and a channel region. The source and drain region are laterally separated by the trench in which the trenched polysilicon gate is formed and partially extend laterally beneath the bottom surface of the trench. The channel region is formed in the silicon substrate beneath the bottom surface of the trench. In one embodiment, the top surface of the trenched polysilicon gate is substantially planar to the substrate surface. In another embodiment, the top surface and a portion of the trenched polysilicon gate are disposed above the substrate surface.

**17 Claims, 10 Drawing Sheets**



200



<u>100</u>

# FIG. 1
(PRIOR ART)



FIG. 2A



200

FIG. 2B



**FIG. 2C**



**FIG. 2D**



FIG. 3A



FIG. 3B



FIG. 3C



FIG. 3D          <u>300</u>



FIG. 3E          <u>300</u>



FIG. 3F          <u>300</u>



**FIG. 3G**          300

**FIG. 3H**          300

**FIG. 3I**          300



FIG. 3J          <u>300</u>



FIG. 3K          <u>300</u>



**FIG. 3L**



**FIG. 3M**



FIG. 4A



FIG. 4B

6,097,061

1

# TRENCHED GATE METAL OXIDE SEMICONDUCTOR DEVICE AND METHOD

### RELATED APPLICATIONS

The subject matter of this application is related to the subject matter of commonly assigned U.S. patent applications having the following serial numbers and titles: Ser. No. 09/052,057 "A Trenched Gate Non-Volatile Semiconductor Device and Method;" Ser. No. 09/052,058, "Trenched Gate Semiconductor Device and Method for Low Power Applications"; and Ser. No. 09/052,062, "A Trenched Gate Non-Volatile Semiconductor Device and Method with Corner Doping and Sidewall Doping", all concurrently filed herewith.

### FIELD OF THE INVENTION

The present invention relates generally to semiconductor devices and methods of manufacture, and more particularly, to semiconductor devices and methods of manufacture including a trenched gate.

### BACKGROUND OF THE INVENTION

Conventional Metal Oxide Semiconductor (MOS) transistors for use in semiconductor devices are typically constructed with the gate being formed on a top surface of the semiconductor substrate. FIG. 1 is a cross-sectional view of a cell structure of a conventional MOS transistor 100 including a substrate 102 of a semiconductor crystal such as silicon. The transistor 100 also includes a channel region 104, a source region 106, a drain region 108, a gate dielectric layer 110, and a gate electrode 112. As shown in FIG. 1, the gate dielectric layer 110 and the gate electrode layer 112 are disposed on a top surface of the substrate 102.

As semiconductor devices and integrated circuits are scaled down in size, demands for the efficient use of space have increased. Heretofore, conventional MOS circuits have utilized a device structure in which the transistor gate is formed on a top surface of the silicon substrate as shown in FIG. 1. However, this type of device structure is limited in the degree to which active devices can be made smaller in order to improve packing density and performance.

### SUMMARY OF THE INVENTION

In accordance with the present invention, a semiconductor device is fabricated to include a trenched polysilicon gate which is formed in a trench of a semiconductor substrate. The trenched polysilicon gate structure improves the overall topography of the structure for better process control and improved manufacturability. The trenched polysilicon gate structure of the present invention also advantageously improves the device packing density and scaleability by reducing the lateral diffusion of the source and drain regions under the trenched polysilicon gate. This invention also minimizes the process variations of overlaps between the trenched polysilicon gate and the source and drain regions.

In one embodiment of the present invention, a device structure for an MOS circuit includes a trenched polysilicon gate. The trenched polysilicon gate is formed in a trench etched into the semiconductor substrate. The device structure further includes a source region, a drain region and a channel region which is implanted in the substrate beneath the bottom surface of the trench. In one embodiment, the top surface of the trenched polysilicon gate is substantially planar to the substrate surface. In another embodiment, the top surface and a portion of the trenched polysilicon gate are

2

above the substrate surface. In yet another embodiment of the present invention, a layer of tungsten silicide or tungsten film is formed over the top surface of the trenched polysilicon gate. In still yet another embodiment, a layer of tungsten silicide or tungsten film is also formed on the side surfaces of the trenched polysilicon gate.

In accordance with one embodiment of the present invention, an MOS device with a trenched polysilicon gate is fabricated by first etching a trench in the silicon substrate and implanting the substrate with dopant impurities to form a channel region beneath the trench. A trench-to-gate insulating layer is formed in the trench followed by a layer of polysilicon to form the trenched polysilicon gate. In one embodiment, the polysilicon gate layer is planarized until the polysilicon is substantially planar with the substrate surface, and a layer of tungsten silicide is formed on the surface of the trenched polysilicon gate. In another embodiment, the polysilicon layer is patterned and etched to form a trenched polysilicon gate having a portion of the polysilicon above the substrate surface. A layer of tungsten silicide is then formed on the trenched polysilicon gate. In yet another embodiment, the polysilicon gate layer is planarized or patterned with tungsten film as transistor gate interconnects.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is cross-sectional view of a conventional single gate transistor.

FIGS. 2A–2D are, respectively, a top, schematic view and three cross-sectional views of an MOS device embodying the principles of the present invention.

FIGS. 3A–3M are cross-sectional views of a semiconductor substrate in various stages of processing in accordance with one embodiment of the present invention.

FIGS. 4A and 4B comprise a flow chart representing the stages of manufacture according to the illustrated embodiment of FIGS. 3A–3M.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 2A is a top schematic view of one embodiment of single gate MOS devices fabricated according to the principles of the present invention. FIG. 2A shows semiconductor structures 200 and 201 supported on a semiconductor substrate 202 of a semiconductor crystal such as silicon, according to one embodiment of the present invention. The substrate 202 is preferably p-doped or provided with a p-well diffusion region to a suitable threshold voltage level in accordance with conventional silicon semiconductor fabrication techniques. FIG. 2A further shows source regions 206, drain regions 208, and a layer of tungsten silicide 220 patterned to serve as an interconnect for structures of multiple devices. Alternatively, polysilicon may also be used to form the interconnects between multiple device structures. While the different embodiments of the present invention will now be described in terms of a single device structure, it should be recognized that the underlying structures of the present invention may also be coupled to other structures as shown in FIG. 2A to form an array for a semiconductor device, such as a memory array. The interconnection between multiple device structures is described below in more detail with reference to FIGS. 3A–3M.

FIG. 2B is a cross-sectional view of one embodiment of a single gate MOS device fabricated according to the principles of the present invention. FIG. 2B shows a cross-

6,097,061

3

sectional view of semiconductor structure **200** of FIG. **2A** along line AA'. Structure **200** includes a channel region **204**, a source region **206**, a drain region **208**, a trench **210**, a trench-to-gate insulating layer **212** and a trench gate electrode **218**. Source region **206** and drain region **208** are diffusion regions of semiconductor material that are doped with impurities that have a conductivity opposite to the conductivity of substrate **202**. For example, when substrate **202** is p-doped, then the opposite conductivity type for source region **206** and drain region **208** is n-type. Preferably source region **206** and drain region **208** are doped with "donor" or n-type impurities of phosphorous, arsenic or the like in conventional manner with a dose range on the order of approximately 1E14 atoms cm⁻² to approximately 1E16 atoms cm⁻². Source region **206** and drain region **208** have a depth substantially equal to or greater than the depth of trench **210** and partially extend laterally underneath the bottom of trench **210** to form source and drain junctions disposed along portions of the sidewalls and bottom surface of trench **210**. Channel region **204** is an implanted region formed beneath the bottom surface of trench **210** and is immediately contiguous source region **206** and drain region **208**. According to one embodiment of the present invention, trench **210** is between approximately 100 Å and 5000 Å wide and from approximately 100 Å to 5000 Å deep. Preferably, trench **210** has rounded corners at the top and bottom of the trench, and the angle of the walls of trench **210** is substantially normal to the top surface. Alternatively, the angle of the trench walls may be slightly sloped to diverge upwardly. Trench-to-gate insulating layer **212** preferably comprises a trench dielectric spacer **214** formed on the vertical surfaces inside trench **210** and a trench gate dielectric **216** formed on the bottom surface inside trench **210**. Trench dielectric spacer **214** has preferably a low dielectric constant (K). The thickness of trench dielectric spacer **214** is selected according to the width of trench **210** in order to minimize conduction through the sidewalls of trench **210** and to be optimized for the operational voltage of the device. Trench dielectric spacer **214** also reduces the gate to source and drain capacitance coupling for increased device operation speed. In a preferred embodiment, trench **210** is approximately 3000 Å to 5000 Å wide and trench dielectric spacer **214** is approximately 300 Å thick formed preferably of a fluorine-doped thermal oxide, a deposited high temperature oxide (HTO), or composited dielectric films with a K which is approximately equal to or less than 3.5. Trench gate dielectric **216** is preferably a high K dielectric such as nitrided oxide and is scaled according to the same criteria as those used for trench dielectric spacer **214** but with a thinner thickness than trench dielectric spacer **214**. The preferred thickness is approximately 100 Å thick. Trenched gate electrode **218** is formed over trench-to-gate insulating layer **212** and has a top surface which is substantially planar with a surface of substrate **202**. Trenched gate electrode **218** is a conductive material such as polysilicon is preferably doped with n-type material or a layer of polysilicide and is approximately of the same thickness as the depth of trench **210**. Alternatively, trenched gate electrode **218** may comprise several layers, such as polysilicon with a layer of tungsten silicide. In one embodiment, a layer of tungsten silicide **220** is formed on the top surface of trenched gate electrode **218** and tungsten film is patterned on the top surface to electrically interconnect structure **200** to other device structures.

FIG. **2C** is a cross-sectional view of another embodiment of the present invention in which the top surface and a portion of the trenched gate electrode are above the surface of substrate. FIG. **2C** shows a cross-sectional view of

4

semiconductor structure **200** of FIG. **2A** along line AA'. Semiconductor structure **200** includes a channel region **204**, a source region **206**, a drain region **208**, a trench **210**, and a trench-to-gate insulating layer **212** as described previously with respect to FIG. **2B**. In the present embodiment, structure **200** also includes a trenched gate electrode **218** which is formed over trench-to-gate insulating layer **212** with a top surface and a portion of trenched gate electrode **218** formed above the surface of substrate **202**. Trenched gate electrode **218** is a conductive material such as polysilicon preferably doped with n-type material or a layer of polysilicide and has a total thickness greater than the depth of trench **210**. Alternatively, trenched gate electrode **218** may comprise several layers such as polysilicon with a layer of tungsten silicide. In one embodiment, a layer of tungsten silicide **220** is formed on the top surface of trenched gate electrode **218**. Trenched gate spacers **222** may also be formed at the vertical sides of trenched gate electrode **218** and at the vertical sides of tungsten silicide layer **220**.

FIG. **2D** is a cross-sectional view of yet another embodiment of the present invention in which the top surface and a portion of the trenched gate electrode are above the surface of substrate **202**. FIG. **2D** shows a cross-sectional view of semiconductor structure **200** of FIG. **2A** along line AA'. In such embodiment, tungsten silicide layer **220** is formed on the top surface and the vertical side surfaces of trenched gate electrode **218**. Trenched gate spacers **222** are formed at the vertical sides of tungsten silicide layer **220** and tungsten lines are patterned to connect the trenched gate electrodes.

One advantage of the present invention is that the trenched gate electrode provides a device structure with a topology which is more planar than conventional MOS devices, thereby improving the process control and manufacturability of the device. Additionally, the trenched gate device structure improves the scaleability of the device and packing density by reducing the lateral diffusion of the source and drain regions under the trenched gate. The diffusion of the source and drain regions that wraps around the corners of the bottom of the trench is a corner-limiting diffusion process and this reduces the lateral diffusion of the source and drain regions under the trenched gate. The corner-limiting diffusion process is primarily due to the corner effects of the gate trench. In this case, source and drain implants are positioned in regions next to the sidewalls of the trench with the deepest as-implanted dopant peak substantially the same as the trench depth before thermal anneal. During anneal, the lateral diffusion of the source and drain junctions beneath the bottom surface of the trench is constrained by the amount of dopants available at the corner and by the radial nature of the diffusion process. As a result, only a low percentage of dopant can go around the bottom corner and it's a fairly self-limiting process.

FIGS. **3A–3M** are cross-sectional views of a semiconductor substrate in various stages of processing in accordance with one embodiment of the present invention. Except where indicated, the cross-sectional views shown in FIGS. **3A–3M** are cross-sectional views taken along line AA' in FIG. **2A**. While the present invention will now be described in terms of fabricating a single device structure, it should be recognized that the underlying process of the present invention may be employed to fabricate multiple devices on a single substrate. FIG. **3A** is a cross-sectional view of a semiconductor wafer **300** comprising a substrate **302**, a pad oxide layer **304** and a nitride layer **306**. A photoresist layer **308** is formed on nitride layer **306**. According to one embodiment of the present invention, semiconductor substrate **302** is of a desired semiconductor material such as

6,097,061

5

6

pre-doped silicon. Typically, the selected semiconductor material will be a silicon wafer cut from a single silicon crystal. Pad oxide layer 304 is grown in conventional manner on top of substrate 302 to a thickness of approximately 100 Å. Nitride layer 306 is deposited in conventional manner as a 1500 Å thick layer by chemical vapor deposition (CVD) on top of pad oxide layer 304. Alternatively, pad oxide layer 304 and nitride layer 306 may be formed by other techniques and used to form isolation trenches. Nitride layer 306 comprises silicon nitride (Si$_3$N$_4$) and serves as a masking layer or etch stop for subsequent oxidation, chemical mechanical planarization, and etch. Pad oxide layer 304 provides stress relief between substrate 302 and nitride layer 306. Conventional photolithographic processing steps are used to mask substrate 302 with photo-resist layer 308 to define the location of a trench in substrate 302 for the trenched gate.

After masking substrate 302 with photo-resist 308, semiconductor wafer 300 is etched to form a trench 310 for the trenched gate electrode. FIG. 3B is a cross-sectional view of semiconductor wafer 300 following an etch step to remove exposed portions of nitride 306 and pad oxide 304 and the underlying silicon substrate in order to form trench 310. Preferably, a Reactive Ion Etch (RIE) is used in conventional manner to form trench 310. The trench etch may include multiple steps such as a nitride etch, an oxide etch, and a high selectivity silicon to oxide etch. Thereafter, photo resist layer 308 is removed in conventional manner. FIG. 3C is a cross-sectional view along line BB' of FIG. 2A of two semiconductor structures formed on substrate 302. FIG. 3C shows trenches 310 of the two structures separated by a field oxide region 309 used for isolation.

A second pad oxide layer 311 is then grown inside trench 310 to a thickness of approximately 100 Å in conventional manner by thermal oxidation in a dry oxygen ambient, either with or without chlorine. After growing second pad oxide layer 311, semiconductor wafer 300 is ion implanted in conventional manner to form a channel region 312. FIG. 3D is a cross-sectional view of semiconductor wafer 300 following ion implantation of channel region 312. In a preferred embodiment of the present invention, channel region 312 is formed using an implant of boron with a dose range on the order of 1E12 atoms cm$^{-2}$ to 1E15 atoms cm$^{-2}$ and an energy of approximately 1 keV to 60 keV at an angle of approximately 0 degrees. In one embodiment, second pad oxide layer 311 is then removed in conventional manner before forming trench-to-gate dielectric layer 314.

Next, a trench-to-gate dielectric layer is formed in trench 310 to isolate the trenched gate from trench 310. The trench-to-gate dielectric layer preferably comprises a trench spacer dielectric layer 316 formed in conventional manner on upright vertical side walls or side surfaces inside trench 310, and a trench dielectric 318 formed on a bottom surface inside trench 310. FIG. 3E shows a cross-sectional view of semiconductor wafer 300 following formation of the trench spacer dielectric layer 316. First, trench spacer dielectric layer 316, such as a layer of thermally grown and/or deposited oxide and preferably doped with fluorine is formed in conventional manner in trench 310. Preferably, the fluorine doped oxide has a K lower than about 3.5 and a thickness of approximately 300 Å. Trench spacer dielectric layer 316 is then etched in conventional manner, preferably using reactive ion etch (RIE) to remove the trench spacer dielectric layer 316 from the bottom surface of trench 310 thereby leaving trench spacer dielectric layer 316 on the vertical sides inside trench 310. In a preferred embodiment of the present invention, a soft silicon etch can be included

as a last step of the trench spacer dielectric etch to remove the damaged silicon at the bottom surface of trench 310. After formation of trench spacer dielectric layer 316, trench dielectric 318 is fabricated inside trench 310. FIG. 3F is a cross-sectional view of semiconductor wafer 300 following formation of trench dielectric 318. Trench dielectric 318 is thermally grown or deposited in conventional manner on the bottom surface of trench 310.

Next, substrate 302 is deposited with a layer of polysilicon 320 to form a trenched gate. FIG. 3G is a cross-sectional view of semiconductor wafer 300 following deposition of polysilicon layer 320. The thickness of polysilicon layer 320 is selected according to the depth of the trench 310. In a preferred embodiment of the invention, the thickness of polysilicon layer 320 is between about 1000 Å and 10,000 Å. Typically, polysilicon layer 320 is formed in conventional manner by low pressure chemical vapor deposition (LPCVD) and is doped in situ in conventional manner.

In one embodiment of the present invention, polysilicon layer 320 is subsequently planarized to remove portions of the polysilicon and to provide a trenched gate which is substantially planar with a top surface of substrate 302. FIG. 3H is a cross-sectional view of semiconductor wafer 300 following planarization of polysilicon layer 320. Polysilicon layer 320 can be planarized by using conventional techniques such as chemical-mechanical planarization (CMP). Nitride layer 306 is used as an etch stop for the planarization process. FIG. 3I is a cross-sectional view along line BB' of FIG. 2A of two semiconductor structures formed on substrate 302 following planarization of polysilicon layer 320. In one embodiment, conventional photolithographic steps are used to mask areas of polysilicon layer 320 so that the residual polysilicon layer can be removed selectively. The remaining areas of residual polysilicon are used to interconnect multiple trenched gates. FIG. 3I shows one embodiment of how multiple device structures embodying the principles of the present invention may be interconnected to form an array for a semiconductor device, such as a memory array. Nitride layer 306 and a portion of polysilicon layer 320 above the silicon dioxide interface are then removed by a plasma etch as shown in FIG. 3J.

In a preferred embodiment, a layer of tungsten silicide is formed on the top surface of polysilicon layer 320. After plasma etching nitride layer 306 and a portion of polysilicon layer 320, a layer of tungsten is deposited in conventional manner on substrate 302. Semiconductor wafer 300 is then annealed in conventional manner. A layer of silicide is then formed in conventional manner on substrate 302 to form a layer of tungsten silicide 322 on the surface of polysilicon layer 320. The tungsten film is then selectively removed in conventional manner. FIG. 3K is a cross-sectional view of semiconductor wafer 300 following formation of tungsten silicide layer 322. Standard MOS processing steps are then used to form source and drain regions and to complete processing of the trenched gate MOS device.

In another embodiment of the present invention, the top surface and a portion of the trenched gate are formed above the substrate surface as shown in FIGS. 2C and 2D. In one embodiment, after depositing substrate 302 with polysilicon 320, a layer of tungsten silicide 324 is formed on polysilicon layer 320 in conventional manner. Thereafter, conventional photolithographic steps are used to mask areas of polysilicon layer 320 and tungsten silicide layer 324 in order to selectively pattern polysilicon layer 320. Trenched gate spacers 326 are then formed in conventional manner at the vertical sides of polysilicon layer 320 and at the vertical sides of tungsten silicide layer 324. Trenched gate spacers 326 are

6,097,061

7

preferably formed by depositing a spacer oxide in conventional manner over wafer **300** followed by a conventional RIE etch to remove the spacer oxide from the horizontal surfaces of wafer **300**. FIG. 3L is a cross-sectional view of semiconductor wafer **300** following formation of trenched gate spacers **326**. Finally, standard MOS processing steps are used to form source and drain regions and to complete processing of the trenched gate MOS device.

In yet another embodiment of the present invention in which the trenched gate is formed having a top surface and a portion of the trenched gate above the substrate surface, a layer of tungsten silicide is formed on the top surface and at the vertical side surfaces of polysilicon layer **320**. After depositing substrate **302** with polysilicon **320**, conventional photolithographic steps are used to pattern polysilicon layer **320**. A layer of tungsten is then deposited in conventional manner on substrate **302** and annealed in conventional manner. A layer of silicide is then formed in conventional manner on substrate **302** to form tungsten silicide **328** on both the top surface and vertical side surfaces of polysilicon **320** which lie above the surface of substrate **302**. Trenched gate spacers **330** are then formed in conventional manner at the vertical sides of tungsten silicide **328**. FIG. 3M is a cross-sectional view of semiconductor wafer **300** following formation of trenched gate spacers **330**. Finally, standard MOS processing steps are used to form source and drain regions and to complete processing of the trenched gate MOS device.

FIGS. 4A and 4B comprise a flow chart detailing one embodiment of the method of the present invention for producing a trenched gate MOS device in accordance with the present invention. After a semiconductor substrate of a desired semiconductor material is selected **400** for processing, a pad oxide layer and a nitride layer are formed **402**, **404** on the substrate. The oxide/nitride layer is then masked with a photo-resist layer to define the location of the trench for the trenched gate **406**. The exposed oxide/nitride layer and the underlying silicon substrate are etched **408** to form the trench for the trenched gate and the photo-resist mask is removed **410**. A second pad oxide layer is then grown **412** on the substrate. Thereafter, the substrate is ion implanted to form **414** the channel region for the device. A trench-to-gate dielectric layer for insulating the trenched gate from the trench is formed **418** at the vertical sides and on the bottom surface inside the trench. A polysilicon layer is then deposited **420** on the substrate and in the trench, and the trenched gate electrode is formed **422**. Finally, standard MOS processes are used to complete **424** processing of the structure.

What is claimed is:

1. A semiconductor transistor comprising:

a semiconductor substrate of a first conductivity type;

a source region of a second conductivity type in the semiconductor substrate;

a drain region of the second conductivity type spaced from the source region in the semiconductor substrate;

a trench having substantially upright vertical surfaces and a bottom surface formed in the semiconductor substrate intermediate the source and drain regions;

a channel region formed in the semiconductor substrate, the channel region forming a contiguous region beneath the bottom surface of the trench and immediately contiguous to the source and drain regions;

a trench-to-gate insulating layer formed on the substantially upright vertical surfaces and the bottom surface inside the trench, the trench-to-gate insulating layer forming a contiguous layer inside the trench; and

8

a trenched gate electrode having a top surface and formed on the trench-to-gate insulating layer inside the trench.

2. The semiconductor transistor of claim **1** wherein the first conductivity type is n-type and the second conductivity type is p-type.

3. The semiconductor transistor of claim **1** wherein the first conductivity type is p-type and the second conductivity type is n-type.

4. The semiconductor transistor of claim **1** wherein the trench-to-gate insulating layer further comprises:

a trench spacer dielectric layer formed on the substantially upright vertical surfaces inside the trench; and

a trench dielectric formed on the bottom surface inside the trench.

5. The semiconductor transistor of claim **1** wherein the top surface of the trenched gate electrode is substantially planar to the substrate surface.

6. The semiconductor transistor of claim **5** further comprising a layer of tungsten silicide formed on the top surface of the trenched gate electrode.

7. The semiconductor transistor of claim **1** wherein the source and drain regions are formed by a self-limited diffusion process.

8. The semiconductor transistor of claim **1** wherein the top surface and a portion of the trenched gate electrode are disposed above the top surface of the semiconductor substrate.

9. The semiconductor transistor of claim **8** further comprising a layer of tungsten silicide formed on the top surface.

10. The semiconductor transistor of claim **9** further comprising a layer of tungsten silicide formed on the substantially upright vertical side surfaces of the trenched gate electrode.

11. A semiconductor device comprising an array of multiple device structures supported on a semiconductor substrate of a first conductivity type, each device structure spaced from other device structures and comprising:

a source diffusion region of a second conductivity type in the semiconductor substrate;

a drain diffusion region of the second conductivity type spaced from the source diffusion region in the semiconductor substrate;

a trench having substantially upright vertical surfaces and a bottom surface formed in the semiconductor substrate intermediate the source and drain diffusion regions;

a channel region formed in the semiconductor substrate, the channel region forming a contiguous region beneath the bottom surface of the trench and immediately contiguous the source and drain diffusion regions;

a trench-to-gate insulating layer formed on the substantially upright vertical surfaces and the bottom surface inside the trench, the trench-to-gate insulating layer forming a contiguous layer inside the trench; and

a trenched gate electrode formed on the trench-to-gate insulating layer inside the trench.

12. The semiconductor device of claim **11** wherein the first conductivity type is n-type and the second conductivity type is p-type.

13. The semiconductor device of claim **11** wherein the first conductivity type is p-type and the second conductivity type is n-type.

14. The semiconductor device of claim **11** wherein the trench-to-gate insulating layer further comprises:

a trench spacer dielectric layer formed on the substantially upright vertical surfaces inside the trench; and

a trench dielectric formed on the bottom surface inside the trench.

6,097,061

9

10

**15**. The semiconductor device of claim **11** wherein a top surface of the trenched gate electrode is substantially planar to the top surface of the semiconductor substrate.

**16**. The semiconductor device of claim **15** further comprising a layer of tungsten silicide formed on the top surface of the trenched gate electrode.

**17**. The semiconductor device of claim **11** wherein a top surface and a portion of the trenched gate electrode are disposed above the top surface of the semiconductor substrate.

* * * * *

# Exhibit 3

US006388330B1

（12） **United States Patent**
Ngo et al.

（10） Patent No.: **US 6,388,330 B1**
（45） Date of Patent: **May 14, 2002**

（54） **LOW DIELECTRIC CONSTANT ETCH STOP LAYERS IN INTEGRATED CIRCUIT INTERCONNECTS**

（75） Inventors: **Minh Van Ngo**, Fremont; **Dawn M. Hopper**, San Jose; **Robert A. Huertas**, Hollister; **Terri J. Kitson**, San Jose, all of CA (US)

（73） Assignee: **Advanced Micro Devices, Inc.**, Sunnyvale, CA (US)

（ * ） Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

（21） Appl. No.: **09/776,012**

（22） Filed: **Feb. 1, 2001**

（51） Int. Cl.[7] ......................... **H01L 23/48**; H01L 23/52

（52） **U.S. Cl.** ...................... **257/760**; 257/758; 257/759; 257/762; 257/765

（58） **Field of Search** ................................ 438/622–624, 438/629, 631, 633, 634, 637–640, 672, 675, 687, 688, 692, 783, 791; 257/758–760, 762, 765

（56） **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,071,809 A | * | 6/2000 | Zhao .......................... 438/634 |
| 6,168,726 B1 | * | 1/2001 | Li et al. ....................... 216/79 |
| 6,245,662 B1 | * | 6/2001 | Naik et al. .................. 438/622 |

FOREIGN PATENT DOCUMENTS

WO      WO 99/33102      *   7/1999

* cited by examiner

*Primary Examiner*—Ha Tran Nguyen
（74） *Attorney, Agent, or Firm*—Mikio Ishimaru

（57） **ABSTRACT**

An integrated circuit and method of manufacture therefore is provided having a semiconductor substrate with a semiconductor device with a dielectric layer over the semiconductor substrate. A conductor core fills the opening in the dielectric layer. An etch stop layer with a dielectric constant below 5.5 is formed over the first dielectric layer and conductor core. A second dielectric layer over the etch stop layer has an opening provided to the conductor core. A second conductor core fills the second opening and is connected to the first conductor core.

**10 Claims, 2 Drawing Sheets**





FIG. 1 (PRIOR ART)



FIG. 2 (PRIOR ART)



FIG. 3

US 6,388,330 B1

1

# LOW DIELECTRIC CONSTANT ETCH STOP LAYERS IN INTEGRATED CIRCUIT INTERCONNECTS

## TECHNICAL FIELD

The present invention relates generally to semiconductor technology and more specifically to etch stop layers in integrated circuits.

## BACKGROUND ART

In the manufacture of integrated circuits, after the individual devices such as the transistors have been fabricated in and on the semiconductor substrate, they must be connected together to perform the desired circuit functions. This interconnection process is generally called "metalization" and is performed using a number of different photolithographic, deposition, and removal techniques.

Briefly, individual semiconductor devices are formed in and on a semiconductor substrate and a device dielectric layer is deposited. Various techniques are used to form gate and source/drain contacts, which extend up to the surface of the device dielectric layer. In a process called the "damascene" technique, dielectric layers are deposited over the device dielectric layers and openings are formed in the dielectric layers. Conductor materials are deposited on the dielectric layers and in the openings. A process is used to planarize the conductor materials with the surface of the dielectric layers so as to cause the conductor materials to be "inlaid" in the dielectric layers.

More specifically, for a single layer of interconnections a "single damascene" technique is used in which the first channel formation of the single damascene process starts with the deposition of a thin first channel stop layer over the device dielectric layer. The first channel stop layer is an etch stop layer which is subject to a photolithographic processing step which involves deposition, patterning, exposure, and development of a photoresist, and an anisotropic etching step through the patterned photoresist to provide openings to the device contacts. The photoresist is then stripped. A first channel dielectric layer is formed on the first channel stop layer. Where the first channel dielectric layer is of an oxide material, such as silicon oxide ($SiO_2$), the first channel stop layer is a nitride, such as silicon nitride (SiN), so the two layers can be selectively etched.

The first channel dielectric layer is then subject to further photolithographic process and etching steps to form first channel openings in the pattern of the first channels. The photoresist is then stripped.

An optional thin adhesion layer is deposited on the first channel dielectric layer and lines the first channel openings to ensure good adhesion of subsequently deposited material to the first channel dielectric layer. Adhesion layers for copper (Cu) conductor materials are composed of compounds such as tantalum nitride (TaN), titanium nitride (TiN), or tungsten nitride (WN).

These nitride compounds have good adhesion to the dielectric materials and provide fair barrier resistance to the diffusion of copper from the copper conductor materials to the dielectric material. High barrier resistance is necessary with conductor materials such as copper to prevent diffusion of subsequently deposited copper into the dielectric layer, which can cause short circuits in the integrated circuit. However, these nitride compounds also have relatively poor adhesion to copper and relatively high electrical resistance.

Because of the drawbacks, pure refractory metals such as tantalum (Ta), titanium (Ti), or tungsten (W) are deposited

2

on the adhesion layer to line the adhesion layer in the first channel openings. The refractory metals are good barrier materials, have lower electrical resistance than their nitrides, and have good adhesion to copper.

In some cases, the barrier material has sufficient adhesion to the dielectric material that the adhesion layer is not required, and in other cases, the adhesion and barrier material become integral. The adhesion and barrier layers are often collectively referred to as a "barrier" layer herein.

For conductor materials such as copper, which are deposited by electroplating, a seed layer is deposited on the barrier layer and lines the barrier layer in the first channel openings to act as an electrode for the electroplating process. Processes such as electroless, physical vapor, and chemical vapor deposition are used to deposit the seed layer.

A first conductor material is deposited on the seed layer and fills the first channel opening. The first conductor material and the seed layer generally become integral, and are often collectively referred to as the conductor core when discussing the main current-carrying portion of the channels.

A chemical-mechanical polishing (CMP) process is then used to remove the first conductor material, the seed layer, and the barrier layer above the first channel dielectric layer to form the first channels. When a layer is placed over the first channels as a final layer, it is called a "capping" layer and a "single" damascene process is completed. When the layer is processed further for placement of additional channels over it, the layer is a via stop layer.

For more complex integrated circuits, a "dual damascene" technique is used in which channels of conductor materials are separated by interlayer dielectric layers in vertically separated planes and interconnected by vertical connections, or "vias".

More specifically, the dual damascene process starts with the deposition of a thin etch stop layer, or the via stop layer, over the first channels and the first channel dielectric layer. A via dielectric layer is deposited on the via stop layer. Again, where the via dielectric layer is of an oxide material, such as silicon oxide, the via stop layer is a nitride, such as silicon nitride, so the two layers can be selectively etched.

Second channel stop and second channel dielectric layers are formed on the via dielectric layer. Again, where the second channel dielectric layer is of an oxide material, such as silicon oxide, the second channel stop layer is a nitride, such as silicon nitride, so the two layers can be selectively etched. The second channel and via stop layers and second channel and via dielectric layers are then subject to further photolithographic process, etching, and photoresist removal steps to form via and second channel openings in the pattern of the second channels and the vias.

An optional thin adhesion layer is deposited on the second channel dielectric layer and lines the second channel and the via openings.

A barrier layer is then deposited on the adhesion layer and lines the adhesion layer in the second channel openings and the vias.

Again, for conductor materials such as copper and copper alloys, a seed layer is deposited by electroless deposition on the barrier layer and lines the barrier layer in the second channel openings and the vias.

A second conductor material is deposited on the seed layer and fills the second channel openings and the vias.

A CMP process is then used to remove the second conductor material, the seed layer, and the barrier layer above the second channel dielectric layer to form the second

US 6,388,330 B1

3

channels. When a layer is placed over the second channels as a final layer, it is called a "capping" layer and the dual damascene process is completed.

The capping layer may be an etch stop layer and may be processed farther for placement of additional levels of channels and vias over it. Individual and multiple levels of single and dual damascene structures can be formed for single and multiple levels of channels and vias, which are collectively referred to as "interconnects".

The use of the single and dual damascene techniques eliminates metal etch and dielectric gap fill steps typically used in the metalization process. The elimination of metal etch steps is important as the semiconductor industry moves from aluminum (Al) to other metalization materials, such as copper, which are very difficult to etch.

Further for placement of additional levels of channels and vias over it. Individual and multiple levels of single and dual damascene structures can be formed for single and multiple levels of channels and vias, which are collectively referred to as "interconnects".

The use of the single and dual damascene techniques eliminates metal etch and dielectric gap fill steps typically used in the metallization process. The elimination of metal etch steps is important as the semiconductor industry moves from aluminum (Al) to other metallization materials, such as copper, which are very difficult to etch.

With the development of high integration and high-density very large scale integrated circuits, reductions in the size of transistors and interconnects have been accompanied by increases in switching speed of such integrated circuits. The closeness of the interconnects and the higher switching speeds have increased the problems due to switching slow-downs resulting from capacitance coupling effects between the closely positioned, parallel conductive channels connecting high switching speed semiconductor devices in these integrated circuits. Since the capacitance coupling effects are reduced when the dielectric constant of the material between the channels is reduced, this has rendered currently used silicon nitride, which has a dielectric constant in excess of 7.5, problematic for protective dielectric layers, such as etch stop layers.

A solution for reducing the dielectric constant of the materials used in interconnects has been long sought but has eluded those skilled in the art. In this area, even small reductions in the dielectric constant are significant.

## DISCLOSURE OF THE INVENTION

The present invention provides an integrated circuit having a semiconductor substrate with a semiconductor device. A dielectric layer is on the semiconductor substrate and has an opening provided therein. A conductor core fills the opening and an etch stop layer over the first dielectric layer and conductor core has a dielectric constant below 5.5. A second dielectric layer over the etch stop layer has an opening provided to the conductor core. A second conductor core fills the second opening and is connected to the first conductor core. The resulting integrated circuit has reduced capacitive coupling effects and is able to operate at higher speeds.

The present invention further provides a method for manufacturing an integrated circuit having a semiconductor substrate with a semiconductor device. A dielectric layer is formed on the semiconductor substrate and an opening is formed in the dielectric layer. A conductor core is deposited to fill the opening and an etch stop layer with a dielectric constant below 5.5 is formed over the first dielectric layer

4

and conductor core. A second dielectric layer is deposited over the etch stop layer and a second opening is formed. A second conductor core is deposited to fill the second opening. The method allows the integrated circuit to have a denser etch stop layer and results in a reduced dielectric constant for the interlayer dielectric layers as a whole.

The above and additional advantages of the present invention will become apparent to those skilled in the art from a reading of the following detailed description when taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 (PRIOR ART) is a plan view of aligned channels with a connecting via;

FIG. 2 (PRIOR ART) is a cross-section of FIG. 1 (PRIOR ART) along line 2—2; and

FIG. 3 is a cross-section, similar to FIG. 2 (PRIOR ART), showing the etch stop layer according to the present invention.

## BEST MODE FOR CARRYING OUT THE INVENTION

Referring now to FIG. 1 (PRIOR ART), therein is shown a plan view of a semiconductor wafer 100 with a silicon semiconductor substrate (not shown) having as interconnects first and second channels 102 and 104 connected by a via 106. The first and second channels 102 and 104 are respectively disposed in first and second channel dielectric layers 108 and 110. The via 106 is an integral part of the second channel 104 and is disposed in a via dielectric layer 112.

The term "horizontal" as used in herein is defined as a plane parallel to the conventional plane or surface of a wafer, such as the semiconductor wafer 100, regardless of the orientation of the wafer. The term "vertical" refers to a direction perpendicular to the horizontal as just defined. Terms, such as "on", "above", "below", "side" (as in "sidewall"), "higher", "lower", "over", and "under", are defined with respect to the horizontal plane.

Referring now to FIG. 2 (PRIOR ART), therein is shown a cross-section of FIG. 1 (PRIOR ART) along line 2—2. A portion of the first channel 102 is disposed in a first channel stop layer 114 and is on a device dielectric layer 116, which is on the silicon semiconductor substrate. Generally, metal contacts are formed in the device dielectric layer 116 to connect to an operative semiconductor device (not shown). This is represented by the contact of the first channel 102 with a semiconductor contact 118 embedded in the device dielectric layer 116. The various layers above the device dielectric layer 116 are sequentially: the first channel stop layer 114, the first channel dielectric layer 108, a via stop layer 120, the via dielectric layer 112, a second channel stop layer 122, the second channel dielectric layer 110, and a capping or next channel stop layer 124 (not shown in FIG. 1).

The first channel 102 includes a barrier layer 126, which could optionally be a combined adhesion and barrier layer, and a seed layer 128 around a conductor core 130. The second channel 104 and the via 106 include a barrier layer 132, which could also optionally be a combined adhesion and barrier layer, and a seed layer 134 around a conductor core 136. The barrier layers 126 and 132 are used to prevent diffusion of the conductor materials into the adjacent areas of the semiconductor device. The seed layers 128 and 134 form electrodes on which the conductor material of the

5

conductor cores **130** and **136** are deposited. The seed layers **128** and **134** are of substantially the same conductor material as the conductor cores **130** and **136** and become part of the respective conductor cores **130** and **136** after the deposition.

In the past, for copper conductor material and seed layers, highly resistive diffusion barrier materials such as tantalum nitride (TaN), titanium nitride (TiN), or tungsten nitride (WN) are used as barrier materials to prevent diffusion.

The first channel stop layer **114**, the via stop layer **120**, and the second channel stop layer **122** are used as layers to stop the etching process which are used to etch and make the various channel and via openings in the respective first channel dielectric layer **108**, the via dielectric layer **112**, and the second channel dielectric layer **110**. The stop layers are of a dielectric material deposited to a thickness "T" by a 500-watt plasma deposition process in an ammonia ($NH_3$) atmosphere at 4.8 torr pressure. Generally, the stop layer material is silicon nitride (SiN, $Si_xN_y$), which has a dielectric constant above 7.5 and which is deposited to a thickness "T" from 470 Å to 530 Å.

Referring now to FIG. **3**, therein is shown a cross-section similar to that shown in FIG. **2** (PRIOR ART) of a semi-conductor wafer **200** of the present invention. The semiconductor wafer **200** has first and second channels **202** and **204** connected by a via **206**. The first and second channels **202** and **204** are respectively disposed in first and second dielectric layers **208** and **210**. The via **206** is a part of the second channel **204** and is disposed in a via dielectric layer **212**.

A portion of the first channel **202** is disposed in a first channel stop layer **214** and is on a device dielectric layer **216**. Generally, metal contacts (not shown) are formed in the device dielectric layer **216** to connect to an operative semi-conductor device (not shown). This is represented by the contact of the first channel **202** with a semiconductor device gate **218** embedded in the device dielectric layer **216**. The various layers above the device dielectric layer **216** are sequentially: the first channel stop layer **214**, the first channel dielectric layer **208**, a via stop layer **220**, the via dielectric layer **212**, a second channel stop layer **222**, the second channel dielectric layer **210**, and a next channel stop layer **224**.

The first channel **202** includes a barrier layer **226** and a seed layer **228** around a conductor core **230**. The second channel **204** and the via **206** include a barrier layer **232** and a seed layer **234** around a conductor core **236**. The barrier layers **226** and **232** are used to prevent diffusion of the conductor materials into the adjacent areas of the semi-conductor device. The seed layers **228** and **234** form electrodes on which the conductor material of the conductor cores **230** and **236** is deposited. The seed layers **228** and **234** are of substantially the same conductor material of the conductor cores **230** and **236** and become part of the respective conductor cores **230** and **236** after the deposition.

The first channel stop layer **214**, the via stop layer **220**, and the second channel stop layer **222** are used as layers to stop the etching process which are used to etch and make the various channel and via openings in the respective first channel dielectric layer **208**, the via dielectric layer **212**, and the second channel dielectric layer **210**.

In the present invention, a half thickness, high quality, etch stop layer (compared to the prior art etch stop layer) is deposited.

For example, for silicon nitride, the dielectric constant of an etch stop layer in accordance with the present invention is about 5.5 contrasted to an excess of 7.5 in the prior art.

It has been determined that a number of processes can be used to produce the under 5.5 dielectric constant etch stop

6

layers which are in a thickness "t" as shown in FIG. **3**, where the thickness "t" is from 270 Å to 330 Å thick.

First, multi-layer depositions may be used which eliminates pinholes and produces a denser film. For example, silicon nitride can be deposited in six 50 Å layers, either by successive deposition or by successive deposition and rotation between each deposition of a layer.

Second, for silicon nitride where silane ($SiH_4$) is used with ammonia ($NH_3$), the gas flow can be reduced and the pressure can be increased. For example, silicon nitride is formed in a plasma process using silane at a flow rate of 170 to 290 sccm and ammonia at a flow rate of 40 to 48 sccm and under a pressure of 4.0 to 4.8 torr

Third, the silane flow may be reduced to about 50% of the prior art flow with increased pressure and nitrogen ($N_2$) can be used in place of the ammonia to reduce hydrogen ($H_2$). For example, silicon nitride is formed in a plasma process using silane at a flow rate of 170 to 290 sccm and nitrogen at a flow rate of 4700 to 6700 sccm and under a pressure of 4.0 to 4.8 torr.

Fourth, a 500 Å thick layer of silicon nitride can be deposited and then densified, for example, at a temperature of 450° C. to 480° C. for up to one hour.

With the reduced dielectric constant and the reduced thickness, the capacitive coupling effect between the first and second channels **202** and **204** is effectively reduced over 25% compared to the prior art.

In various embodiments, the barrier layers are of materials such as tantalum (Ta), titanium (Ti), tungsten (W), compounds thereof, and combinations thereof. The seed layers (where used) are of materials such as copper (Cu), gold (Au), silver (Ag), compounds thereof to and combinations thereof with one or more of the above elements. The conductor cores with or without seed layers are of materials such as copper, aluminum (Al), gold, silver, compounds thereof, and combinations thereof. The dielectric layers are of dielectric materials such as silicon oxide ($SiO_x$), tetraethoxysilane (TEOS), borophosphosilicate (BPSG) glass, etc. with dielectric constants from 4.2 to 3.9 or low dielectric constant dielectric materials such as fluorinated tetraethoxysilane (FTEOS), hydrogen silsesquioxane (HSQ), benzocyclobutene (BCB), etc. with dielectric constants below 3.9.

While the invention has been described in conjunction with a specific best mode, it is to be understood that many alternatives, modifications, and variations will be apparent to those skilled in the art in light of the aforegoing description. Accordingly, it is intended to embrace all such alternatives, modifications, and variations that fall within the spirit and scope of the included claims. All matters hither-to-fore set forth or shown in the accompanying drawings are to be interpreted in an illustrative and non-limiting sense.

The invention claimed is:

1. An integrated circuit comprising:
   a semiconductor substrate having a semiconductor device provided thereon;
   a first dielectric layer formed over the semiconductor substrate having a first opening provided therein;
   a first conductor core filling the first opening and connected to the semiconductor device;
   an etch stop layer of silicon nitride formed over the first dielectric layer and the first conductor core, the etch stop layer having a dielectric constant below 5.5;
   a second dielectric layer formed over the etch stop layer and having a second opening provided therein open to the first conductor core;

US 6,388,330 B1

7

a second conductor core filling the second opening and connected to the first conductor core.

**2**. The integrated circuit as claimed in claim **1** wherein the etch stop layer is a multilayer structure.

**3**. The integrated circuit as claimed in claim **1** wherein the etch stop layer is a multilayer structure with each of the layers having a different layer orientation.

**4**. The integrated circuit as claimed in claim **1** wherein the first and second dielectric layers are of a material having a dielectric constant under 3.9.

**5**. The integrated circuit as claimed in claim **1** wherein the conductor core contains a material selected from a group consisting of copper, aluminum, gold, silver, a compound thereof, and a combination thereof.

**6**. An integrated circuit comprising:

a semiconductor substrate having a semiconductor device provided thereon;

a first dielectric layer formed over the semiconductor substrate having a first opening provided therein;

a first conductor core filling the first opening and connected to the semiconductor device;

a via etch stop layer of silicon nitride formed over the first dielectric layer and the first conductor core, the via etch stop layer having a dielectric constant below 5.5;

8

a via dielectric layer formed over the via etch stop layer and having a via opening provided therein open to the first conductor core;

a channel etch stop layer of silicon nitride formed over the via dielectric layer, the channel etch stop layer having a dielectric constant below 5.5;

a second dielectric layer formed over the via dielectric layer and having a second opening provided therein open to the via opening; and

a second conductor core filling the via and second openings and connected to the first conductor core.

**7**. The integrated circuit as claimed in claim **6** wherein the via and channel etch stop layers are a multilayer structure.

**8**. The integrated circuit as claimed in claim **6** wherein the via and channel etch stop layers are multilayer structures with each of the layers having a different layer orientation.

**9**. The integrated circuit as claimed in claim **6** wherein the first, via, and second dielectric layers are of a material having a dielectric constant under 3.9.

**10**. The integrated circuit as claimed in claim **6** wherein the first and second conductor cores contain materials selected from a group consisting of copper, gold, silver, a compound thereof, and a combination thereof.

* * * * *